THE CENTRAL STOCK AND GRAIN EXCHANGE

*v.*

THE BOARD OF TRADE OF THE CITY OF CHICAGO *et al.*

*Opinion filed April 16, 1902.*

1. BUCKET-SHOPS—*when decision whether complainant keeps a bucket shop is necessary.* Upon a bill to enjoin the defendant telegraph company from refusing to furnish market quotations to the complainant, if the sole defense is that the complainant keeps a bucket shop, the decision of that question is essential to the final disposition of the case, since, aside from any questions of pleading, the chancellor must deny the prayer if it appears to him that the aid of the court is sought to further a violation of law.

2. SAME—*purpose of act of 1887 against bucket-shops.* The object of the act of 1887, (Laws of 1887, p. 96,) to suppress bucket-shops, etc., is to prevent gambling in grain or other commodities, and is directed against the keeper of any place wherein is permitted the buying or selling of grain or produce, on margins or otherwise, without any intention of actual delivery.

3. SAME—*a party conducting business must know that the customers are buying in good faith.* The fact that a party running a grain or produce exchange on market quotations does not inquire of his customers as to their intentions does not shield him from criminal responsibility under the act of 1887, since he must know, or in good faith have reason to believe, the buying and selling are *bona fide* and not within the prohibition of the statute.

4. SAME—*what proof establishes the keeping of bucket-shop.* Evidence that the main part of a party's business is dealing in futures on margins, without any intention of delivering the grain sold or re-

ceiving that purchased, is sufficient to establish the keeping of a bucket-shop such as is prohibited by the act of 1887.

5. SAME—*what does not establish bona fide intention to avoid violation of law.* The fact that a stock and grain exchange requires its customers to sign contracts to receive the commodities purchased does not establish that the purchases were not within the prohibition of the statute, where the evidence also shows that any customer objecting to delivery had no difficulty in settling with the exchange by payment of differences.

6. EVIDENCE—*what not relevant in bucket-shop case.* In an action to enjoin the Chicago Board of Trade and a telegraph company from refusing to furnish complainant with market quotations, evidence that the board of trade conducted its business upon the same plan as that pursued by the complainant is irrelevant.

7. SAME—*effect where a party refuses to testify on ground of privilege.* In a civil action, if a party, upon the ground of privilege, refuses to answer relevant questions or to produce evidence in his possession and control, the presumption is that the testimony, if given, or the evidence, if produced, would be unfavorable to him. (BOGGS, J., does not concur.)

8. INJUNCTION—*when enforcement of rule of board of trade should not be enjoined.* A rule of a board of trade prohibiting its members from executing any orders for customers without a *bona fide* purchase and sale of property for actual delivery is not unreasonable nor in violation of law, and its enforcement should not be enjoined.

*Board of Trade* v. *Central Stock Exchange*, 98 Ill. App. 212, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. E. P. VAIL, Judge, presiding.

The following is the statement of the case and the opinion of the Appellate Court made and delivered by Mr. Justice ADAMS:

*Statement.*—"July 28, 1901, appellee filed a bill against the Board of Trade of the city of Chicago and the Western Union Telegraph Company, alleging that appellee is an Illinois corporation and is engaged in the business of dealing in grain, provisions, produce and other commodities in the city of Chicago; that the Western Union Telegraph Company, which, by arrangement with the board of trade, transmitted to third persons the market

quotations of the board, had, by the request of appellee, so strung its wires as to connect them with appellee's place of business in the city of Chicago and there attached them to instruments placed there by said telegraph company, and by means thereof communicated with appellee and delivered to it said market quotations; that said market quotations are affected with a public interest, and that the successful management of appellee's business depends entirely upon receiving, instantaneously and continuously, the said market reports. The bill avers that the board of trade has threatened to prevent the market reports from being transmitted to appellee, and to withhold from the telegraph company information as to the market quotations and to prevent the transmission to appellee of said quotations. The bill charges that it is the intention of the telegraph company, at the instigation of the board of trade, to cut off and disconnect its wires communicating with appellee's place of business and to remove therefrom the instruments and means of obtaining the market quotations. The bill also avers that the board has forbidden its own members to deal with certain members of the public who are in receipt of certain market information, and who are engaged in the same kind of business as that conducted by members of the board on the floor of its exchange, but in competition with said members, under a penalty of disciplining any of its members who shall violate such regulation, etc.

"On the filing of the bill an injunction was issued, as prayed in the bill, enjoining the Western Union Telegraph Company and the Board of Trade of the city of Chicago from cutting off or disconnecting the telegraph wires from the line or lines of wires or circuits over which the market information of the board of trade has been and is being transmitted to the Central Stock and Grain Exchange at its place of business in Chicago, and from removing therefrom the instruments and appliances

used in connection with said wires, and enjoining the board of trade from doing anything to prevent the Western Union Telegraph Company from gathering such information and market news of transactions on the board and furnishing them to complainant, and from making any contract with any person that will prevent the Western Union Telegraph Company or complainant from receiving said quotations as promptly as any other person, and from doing any act discriminating against complainant respecting the said quotations, and from interfering with or prohibiting any person, firm or corporation, being a member of the board of trade, from doing business with the complainant the same as they do with other persons.

"The Western Union Telegraph Company entered an appearance but filed no answer. July 21, 1900, the board of trade answered, averring, among other things, that appellee is engaged in conducting a bucket-shop, in which it makes with its customers certain pretended contracts respecting the purchase and sale for future delivery of grain and provisions, wherein the parties and the complainant only contemplate that such contracts or trades shall be settled according to the public market quotations of this defendant, without any *bona fide* transaction or contract for actual delivery, and that said pretended contracts or trades are, in reality, but bets upon market prices, and that said market quotations are necessary to enable appellee to conduct said business. The answer further avers that by reason of the giving of the market quotations to bucket-shops by the telegraph companies, it adopted June 25, 1900, certain regulations concerning the distribution of the quotations, which were put in the form of a contract, which contract was submitted to the telegraph companies, including the Western Union company, with a notice that in order to receive the quotations they must sign the same before August 1; that the Western Union company declined to sign said contract, but

the Cleveland Telegraph Company signed it.    Attached to the answer and made a part thereof is the contract referred to between the board and the Cleveland Telegraph Company.    The contract provides that the board will furnish the market quotations to the telegraph company, and the company agrees as follows:    'Said telegraph company agrees that it will not knowingly furnish or sell, directly or indirectly, said quotations or other news to any other person, firm or corporation conducting a bucket-shop or other similar place where such quotations are used as a basis for bets or other illegal contracts based upon the fluctuations of the price of commodities dealt in on said board of trade; nor will it knowingly continue to furnish such quotations to any person, firm or corporation who shall re-transmit or furnish the same to any person, firm or corporation conducting such bucket-shop or other place, but said telegraph company shall be liable for costs in suits brought to enforce this clause only when it shall actively defend such suit.    Said telegraph company agrees that it will not, directly or indirectly, furnish said quotations to any other telegraph company or other person, firm or corporation engaged in the business of distributing market news by telegraph or telephone, the intent hereof being, that every such telegraph company or other disseminator of news shall come into direct contract relation with and accountability to said board of trade as a condition to its being furnished said quotations and news.'

"It is also averred in the answer that the board has established the following rule for the government of its members:

"'Sec. 8.  Any member of the association who shall be interested or associated in business with or who shall act as the representative of, or who shall knowingly execute any order or orders for the account of any organization, firm or individual engaged in the business of dealing in differences on the fluctuations in the market price of any

commodity, without a *bona fide* purchase and sale of property for an actual delivery, shall be deemed guilty of unmercantile conduct which renders him unworthy to be a member of the association, and upon complaint to and conviction thereof by the board of directors he shall be expelled from membership in the association.'

"August 4, 1900, appellee filed a supplemental bill, averring that while a motion for a dissolution of the injunction was pending, counsel for the board of trade offered, in open court, to permit appellee to receive the quotations through the Cleveland Telegraph Company, and that thereupon an order was entered giving appellee leave to file a supplemental bill, and permitting the Western Union company to discontinue the furnishing of quotations and the board of trade to furnish them to the Cleveland Telegraph Company, and the latter company to furnish them to appellee; that since the making of said order the Cleveland Telegraph Company is performing the same service for appellee which was formerly performed for it by the Western Union company, and that all the allegations of the original bill as to the Western Union company are true as to the Cleveland company. Prayer that appellee may have the same relief against the latter company as prayed in the original bill against the former company.

"The board of trade answered, denying that it assented to any arrangement by which appellee was to receive the quotations from the Cleveland company, and averring that since July 31, 1900, appellee has been receiving the quotations from that company in accordance with a contract between it and the company, set up in the answer of the company.

"The Cleveland company answered, setting out the contract of July, 1900, between it and the board of trade, heretofore referred to, and also setting out a contract between it and appellee for the furnishing by it to appellee of the market quotations of the board of trade,

which contract contains the following undertaking of appellee: 'That said party of the second part agrees that its business is and shall be the business of a dealer in grain, produce, stocks, bonds and other commodities; that said party of the second part is not conducting, and will not conduct, a bucket-shop or other business contrary to the criminal laws of the State of Illinois, or use or allow any one else to use said quotations for that purpose.' It is also provided by the contract that (except in a case not here involved) neither party shall terminate the contract without giving to the other party thirty days' written notice of its intention so to do.

"The cause was heard before the chancellor on the testimony of witnesses and other evidence given and produced in open court. The court found, among other things, that defendants have not, nor has any of them, any right to discriminate between persons and corporations engaged in business, and who are ready to pay for the market quotations and to conform to all reasonable regulations as to the collection and transmission thereof. The temporary injunction is made perpetual by the decree and the relief prayed is granted."

*Opinion.*—"The sole defense set up in the answers is, that appellee is engaged in conducting a bucket-shop,— in other words, that the appellee's business is such as is prohibited by 'An act to suppress bucket-shops and gambling in stocks, bonds, petroleum, cotton, grain, provisions and other produce,' in force July 1, 1897. (1 Starr & Cur. Stat. 1896, p. 1304.) Section 1 of the act provides: 'That it shall be unlawful for any corporation, association, co-partnership or person to keep or cause to be kept within this State any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any corporation, or petroleum, cotton, grain, provisions or other produce, either on margins or otherwise, without any intention of receiving and paying for the property so

bought or of delivering the property so sold, or wherein is conducted or permitted the pretended buying or selling of such property on margins, or when the party buying any of such property, or offering to buy the same, does not intend actually to receive the same if purchased or to deliver the same if sold; and the keeping of all such places is hereby prohibited,' etc. Section 2 of the act is as follows: 'It shall not be necessary, in order to commit the offense defined in section 1 of this act, that both the buyer and the seller shall agree to do any of the acts therein prohibited, but the said person thus pretending or offering to sell, or thus pretending or offering to buy, whether the offer to sell or buy is accepted or not; and any corporation, association, co-partnership or person who shall communicate, receive, exhibit or display, in any manner, any such offer to so buy or sell, or any statements or quotations of the prices of any such property, with a view to any such transaction as aforesaid, shall be deemed an accessory, and upon conviction thereof shall be fined and punished the same as the principal and as provided in section 1 of this act.'

"The Supreme Court, in *Soby* v. *People*, 134 Ill. 66, has in a very careful opinion stated the object of the act and what would be a violation of it. The court say: 'It is manifest that the object of the statute was to suppress and prevent gambling in grain and other commodities.' (Ibid. 71.) Also: 'A consideration of the act will, as before indicated, show that it is directed against the keeping of any office or place, etc., first, wherein is conducted or permitted the pretended buying or selling of grain or other produce, on margins or otherwise, without any intention of receiving the property bought or delivering it if sold. Under this clause of the first section the offense consists in keeping the place, etc., where such buying or selling is conducted or permitted. That plaintiff in error kept the office or place is conceded, and that buying and selling upon margins, without any intention on the part

of the customer to receive the thing bought or to deliver the thing sold, was permitted in such office or place so kept by the plaintiff in error, is also substantially conceded, and if it were not, is abundantly proved. Under this provision of the act the keeper of such office or place, etc., cannot shield himself from criminal responsibility behind the fact that he made no inquiry of his customers. The statute is preventive in its character, and is aimed at the keeping of places where gambling in grain is permitted. The keeper must know that the transaction is not gambling, or, in good faith, have just reason to believe that the buying or selling is not within the intended prohibition of the statute. But if this were not so, there is abundant evidence in this record to show that the plaintiff in error knew that his customers did not contemplate an actual delivery of the commodity bought or sold. Again, the second clause makes it an offense to keep a place, etc., wherein is conducted or permitted the pretended buying or selling of such produce on margins. It is scarcely contended that the customer did not, in fact, intend only to purchase options, and to make money in the rise and fall of the market, without any expectation of receiving or delivering grain. In other words, it is too plain for argument that the buying and selling of grain was a mere pretense,—at least so far as the customer was concerned. Again, the third clause creates the offense where the party buying such produce, or offering to buy the same, does not intend actually to receive the same if purchased or to deliver the same if sold. Here the proof establishes, beyond question, that purchases were made without any intention of receiving the commodity purchased. The only object was to make money on the fluctuations of the market by the pretended purchase of the grain on margins.'

"The evidence in the case is very voluminous. The evidence for the appellants, on whom the court held the burden of proof rested, was mainly directed to proving

that the appellee kept a bucket-shop, within the meaning of the statute; that the dealing at appellee's place of business was solely on the market quotations of the Chicago Board of Trade, and that it knowingly permitted the pretended buying and selling by its customers of grain with reference to such market quotations, and without any intention of receiving the grain ostensibly bought or delivering that ostensibly sold, their only intention being to make money by the rise or fall of the market, as the case might be. Appellee's evidence was mainly directed to proving that a large part of the business of the Board of Trade of the city of Chicago was similar to that of appellee, namely, that grain was bought and sold on the exchange of the board on margins or stop orders, without any intention to deliver the grain, and, incidentally, that there were some deliveries by and to appellee. The evidence shows clearly that the main part of appellee's business was dealing in futures on margins, without any intention of delivering the grain sold or receiving that purchased by it, and that it kept a bucket-shop, within the meaning of the statute, and used the market quotations in its bucket-shop business.

"Appellee's counsel, in their argument, admit that 'actual deliveries and receipts of commodities were not a large percentage of the business transacted,' and this admission is fully sustained by the evidence. It appears that there were some deliveries of grain, but such were exceptional and insignificant in comparison with the bulk of appellee's business. It also appears from the evidence that appellee sent out delivery notices, and in some cases required persons to sign a contract to receive, but when the person receiving such notice or signing such contract objected to delivery, he had no difficulty in settling his trade with appellee by paying or receiving, as the case might be, the difference between the price at which the grain was bought or sold and the price at which the trade was closed by stop order or exhaust of margin.

"The requiring a party who purchased or sold to sign a contract to accept or make delivery is an unusual circumstance and not at all necessary in a *bona fide* transaction, the law in such case being, that the party selling is bound to deliver and the party purchasing is bound to accept delivery. Therefore, the purpose of such a contract must have been something other than the securing of a legal right. Stockton, witness for defendant, testified that McHie, appellee's president, told him that the trades must be based on actual delivery, and that he (witness) would have to sign an agreement to that effect, which he did, but that after he made the agreement, although he sometimes made trades with appellee of 50,000 or 100,000 bushels of grain in a day, he never received from or delivered to appellee one bushel of grain and never saw a warehouse receipt in any transaction he had with appellee. It also appears from the evidence that one of appellee's rules was, that if one of its correspondents sent an order by telegraph, the telegram should not contain a stop order, but if a stop order were intended it must be sent by a second telegram. This, we think, was evidently for the purpose of preventing the original order from apparently showing that the proposed deal was purely speculative. In *Soby* v. *People, supra,* the court say: 'We are of opinion that it is no longer possible in this State, under any shift or device, however specious, to keep an office or other place where parties may, under the pretense of buying or selling grain or other produce, engage in speculation in futures and gamble upon the rise and fall of the market,' etc.

"The court ruled appellee to produce telegrams received in its business since July 1, 1901, which it declined to do on the claim of constitutional privilege, which claim was allowed. The witness Sanderson, clerk of appellee, testifies that he had, as such clerk, recorded on certain sheets trades made with appellee, and appellants moved for a rule on appellee to produce the sheets,

which motion appellee resisted on the same claim of
privilege, and the claim was allowed.   A number of the
witnesses, some of them officers of appellee, refused to
answer questions relevant to the issues, on the like claim
of privilege.   When a party refuses to answer relevant
questions or to produce evidence in his possession or
subject to his control, the presumption is that the tes-
timony, if given, or the evidence, if produced, would be
unfavorable to him.   (1 Jones on Evidence, sec. 17.)   Al-
though such refusal, if based on the ground that the evi-
dence might tend to criminate the party, could not be
used against him in a criminal prosecution, we are in-
clined to the view that in a civil case the general rule as
above stated is applicable.   Evidence produced by the
appellee tending to prove that a large part of the trans-
actions between members of the board of trade is on
futures and purely speculative, and not different in kind
from that done by appellee, is irrelevant.   Appellee is
seeking relief—not the board of trade nor any member
of the board.

"It is certified by the learned judge who tried the
cause that 'it was not necessary to a final disposition of
said cause to determine whether or not the complainant
kept a bucket-shop,' and that such was his view is evi-
denced by the decree, and also by his opinion, a copy of
which is filed in the cause here.   We are committed to
the opposite view.   (*Christie-Street Commission Co.* v. *Board
of Trade*, 94 Ill. App. 229.)   That was a case similar to
the present, in which the appellant, complainant in the
lower court, prayed an injunction to restrain the defend-
ants from refusing to furnish the complainant with the
market quotations, and the defense in that case, as in
this, was that the complainant was keeping a bucket-
shop and wanted the market quotations for use in that
business.   In that case we said: 'But aside from any
question of pleading, we are of opinion that when it ap-
peared to the chancellor that the aid of the court was

sought to enable the complainant (appellant) to carry on an enterprise which was prohibited by the law, the chancellor could not do otherwise than deny the prayer. If it is not within the scope of chancery jurisdiction to punish or prevent crimes at the instance of private suitors, it is surely quite as far removed from the scope of equity to assist the law-breaker in his violation of the statute.'

"The injunction in the present case not only enjoins the appellant from refusing to furnish to appellee the market quotations, but it enjoins the board of trade from enforcing the rule (section 8) copied in the statement preceding this opinion. The temporary injunction enjoined the appellants from 'prohibiting any person, firm or corporation, being a member of the board of trade, from doing business with the complainant, the same as they do with other persons.' The temporary injunction is made perpetual by the final decree. We are of opinion that the rule, enforcement of which is enjoined by the decree, does not infringe public policy or any rule of law and that it is not unreasonable. Such being the case, it was error to enjoin its enforcement. In *Board of Trade* v. *Riordan*, 94 Ill. App. 298, we reversed a decree enjoining the board of trade from trying a member of the board charged with a violation of the rule in question, citing numerous decisions.

"The decree will be reversed."

JACOB J. KERN, CHARLES D. FULLEN, and JOHN A. BROWN, for appellant.

HENRY S. ROBBINS, for appellees.

Per CURIAM: The foregoing opinion of the Appellate Court, from which we have omitted details of the evidence, meets with our full approval, as making a just and proper disposition of the case on the record, and it will be adopted as the opinion of the court. It clearly

appears that the quotations of market prices which appellant sought by its bill to compel appellees to continue to furnish, were used, and were obtained for the purpose of being used, in conducting a business in violation of law as well as of its contract with the telegraph company. Appellant was not entitled to any relief of that character. In this respect the case differs materially from *New York and Chicago Grain Exchange* v. *Board of Trade*, 127 Ill. 153.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE BOGGS: I concur in the judgment of affirmance herein. I, however, doubt the soundness of the proposition that if the privilege given by law to decline to answer a question is availed of, a presumption having probative force as evidence arises that the answer would have been unfavorable. Mr. Greenleaf, in his work on Evidence, (vol. 1, 15th ed. p. 600,) says: "If the witness declines to answer, no inference of the truth of the fact is permitted to be drawn from that circumstance." In notes 10 and *f* to the text a number of authorities are cited in support of the conclusion announced by the learned author.

There is authority for the view that if a party to a civil action voluntarily becomes a witness in his own behalf and in the course of his examination claims his privilege to refuse to answer a material and, aside from the privilege, a competent question, the circumstance may be considered and given the like effect as a refusal to produce the evidence which it is in his power to produce. (*Andrews* v. *Fry*, 104 Mass. 234.) But I think the weight of authority is against the position that an adverse party may be called to take the stand as a witness in behalf of his adversary, and his declination to answer a question which he has a legal right to refuse to answer be seized upon as proof of the truth of a supposed fact which it might be implied an answer to the question would disclose.