WESTERN UNION TELEGRAPH COMPANY *v.* STATE, EX REL. HAMMOND ELEVATOR COMPANY ET AL.

[No. 20,387. Filed November 28, 1905.]

1. REMOVAL OF CAUSES.—*Mandamus.—Statutes.*—A proceeding in mandamus is not a suit of a civil nature at common law or in equity and is, therefore, not removable to the federal court under 25 Stat. at Large, p. 433, §§1, 2, U. S. Comp. Stat. 1901, pp. 507-509. p. 494.

2. CARRIERS.—*Discriminations.*—A common carrier must serve the public without discrimination. p. 500.

3. SAME.—*Public-Service.—Duty.*—Where the owner of property devotes same to a public use, he impliedly assents to reasonable public control. p. 500.

4. SAME.—*Telegraphs.—Stock Quotations.—Duty to Furnish.*—Where stock quotations have been furnished many years by a public-service corporation and business has been governed largely by such quotations, such corporation is impressed with a public duty to furnish such quotations, without discrimination, so long as it continues in such business. p. 501.

5. PLEADING.—*Contracts.—How Alleged.*—A pleader who counts upon a written contract must set forth the tenor of such contract in the body of his pleading and also state the facts growing out of such contract upon which he relies for his cause of action or defense, merely making such contract an exhibit being insufficient. p. 506.

6. SAME.—*Abatement.—Defective Parties.—How Shown.*—Where the defect in parties is not apparent upon the face of the complaint, the question must be raised by a verified plea in abatement and the same filed and tried before an answer in bar is filed. p. 509.

7. WORDS AND PHRASES.—*"Bucket-Shops."*—A "bucket-shop" is a place conducted nominally for the transaction of a stock-

exchange or similar business, but really for the registry of bets, usually small, on the rise and fall of prices of articles, there being no transfer or delivery of such articles. p. 509.

8. CONTRACTS.—*Options.—Validity.*—A contract for the purchase or sale of a commodity, not to be delivered, such contract to be performed only by advancing and paying differences, is void at the common law. p. 510.

9. CORPORATIONS.—*Telegraphs.—Stock Quotations.—Right to Discriminate against Unlawful Users.*—A board of trade has the right to require a telegraph company, to whom it sells stock quotations, not to deliver same to persons who desire to use them for gambling purposes. p. 511.

10. MANDAMUS.—*Discretion of Court.*—The writ of mandamus is an extraordinary writ, and should be issued only in the exercise of a sound legal discretion. p. 512.

11. CARRIERS.—*Telegraphs.—Stock Quotations.—Compelling Delivery for Bucket-Shop.*—The operation of "bucket-shops" being an insidious form of gambling and calculated to destroy morality, the courts will not compel a public-service corporation to deliver to the owners of them stock quotations and thus make it possible for such owners to carry on such gambling. p. 512.

From Laporte Superior Court; *H. B. Tuthill,* Judge.

Action by the State of Indiana, on the relation of the Hammond Elevator Company and another, against the Western Union Telegraph Company. From a judgment for plaintiff, defendant appeals. *Reversed.*

*Percy B. Eckhart* and *John B. Peterson,* for appellant. *Crumpacker & Moran, J. J. Kern, J. A. Brown* and *L. C. Whitman,* for appellee.

MONTGOMERY, J.—This is an action of mandamus brought by appellee in the Lake Superior Court to compel appellant, as a public-service corporation, to sell and deliver to the Hammond Elevator Company the continuous market quotations of the Chicago Board of Trade. An alternative writ of mandate was issued and served upon appellant; and, upon being then brought into court, appellant filed its petition and bond for a removal of the cause to the circuit court of the United States, on the ground of diverse citizenship of the parties. This application was denied, and an

exception to the ruling saved. Appellant thereupon filed a plea to the jurisdiction of the court, alleging specially the proceedings in the application for a removal of the cause to the federal court. Upon appellee's motion this plea was stricken out, and to this action appellant excepted. The venue of the cause was changed to the Porter Superior Court, and thence to the Laporte Superior Court. Appellant's demurrer to the amended complaint for want of facts and for a defect of parties was overruled, and a return or answer to the writ filed, consisting of six paragraphs. The first answer in general denial was subsequently withdrawn, and demurrers, for want of facts, to the affirmative answers were sustained, and exceptions to the rulings properly saved. Appellant declined to plead further, and judgment was thereupon entered against it in accordance with the prayer of the complaint.

It is averred in the assignment of errors that the court below erred: In denying appellant's application for a removal of the cause to the federal court, in striking out its plea to the jurisdiction of the state court, in overruling its demurrer to the amended complaint, and in sustaining appellee's demurrer to the second, third, fourth, fifth and sixth paragraphs of answer.

Appellee urges many technical objections to the record, and to appellant's brief, all of which, having been duly considered, and in the main found unsubstantial, we have disregarded.

The first question presented is one of jurisdiction. No objection was urged below, or is here, to the form or sufficiency of appellant's petition and bond for removal; therefore, if this cause is removable to the federal court, upon the timely presentation of such application the jurisdiction of the state court was at once terminated. Appellee contends that original proceedings in mandamus are not within the jurisdiction of circuit courts of the United States, and are not removable to such courts;

and it is admitted by counsel that it was upon this ground that the application for removal was denied in this case.

The section of the federal statutes in relation to the jurisdiction of circuit courts of the United States confers upon them "original cognizance, concurrent with the courts of the several states, of all suits of a civil nature, *at common law* or in equity," where the matter in dispute exceeds, exclusive of interest and costs, $2,000, and in which there is a controversy between citizens of different states. The section providing for the removal of a cause from a state court to the United States Circuit Court employs the same language, except that the suit is to be one "of a civil nature, *at law* or in equity." 25 Stat. at Large, p. 433, §§1, 2, U. S. Comp. Stat. 1901, pp. 507-509.

It has been repeatedly held by the Supreme Court of the United States that an action for a writ of mandamus is not a suit of a civil nature at common law or in equity, within the meaning of the acts of congress creating and defining the jurisdiction of circuit courts of the United States; and that such courts have no jurisdiction of such an action unless it be in aid of a jurisdiction previously acquired. Mandamus was originated at a time when it was supposed that the king in person presided over the court of king's bench. It was a prerogative writ, issuing in the king's name from that court, and the proceedings did not partake of the nature of a suit between parties. The relief sought was granted and effected by means of the writ, but it had none of the elements of a summons or judicial writ requiring a party to appear and plead. The character of the proceeding and the nature of the writ have been materially changed by statute, and in most of the states of the Union a proceeding by mandamus is now considered a civil action. However, the Supreme Court of the United States and some of the federal circuit courts have passed upon the question under consideration, and held that an action of mandamus is not a suit of a civil nature at law or in equity, and not

removable, under the provisions of the federal statutes, from a state court into a circuit court of the United States. *Rosenbaum* v. *Bauer* (1887), 120 U. S. 450, 7 Sup. Ct. 633, 30 L. Ed. 743; *Mystic Milling Co.* v. *Chicago, etc., R. Co.* (1904), 132 Fed. 289; *Kelly* v. *Grand Circle, etc.* (1904), 129 Fed. 830; *State of Indiana* v. *Lake Erie, etc., R. Co.* (1898), 85 Fed. 1. See, also, Black's Dillon, Removal of Causes, §26; 18 Ency. Pl. and Pr., 171. This interpretation of the federal statutes is binding upon us, and in accordance therewith we hold that there was no error in denying appellant's application for a removal of this cause to the circuit court of the United States, or in striking out its plea to the jurisdiction of the state court.

The amended complaint contained the following facts: The relator Hammond Elevator Company is a corporation organized under the laws of the state of Delaware, and the relator Frank C. Williams is secretary of said company and appears herein, not in his personal capacity, but as such secretary. Said elevator company is organized, among other things, for the purpose of buying and selling grain and provisions, stocks and bonds, and other commodities and securities, and is now, and has been since January 1, 1903, engaged at Hammond, Indiana, in such business. Appellant Western Union Telegraph Company is a corporation, and was organized February 18, 1859, under the laws of the state of New York, for the purpose of doing a general telegraph business in, between and among the several states of the United States and elsewhere, and with, between and among all of the inhabitants thereof. It has power and authority, under its charter, and under the laws of said state, and under the laws of the State of Indiana and of the state of Illinois, to gather, buy, transmit and sell news and information to all persons and corporations who may desire the same, and to the public generally throughout all the states. It has been since its incorporation, and is now, doing, and will continue to do, that character of busi-

ness in all of the states aforesaid, and with and for all of the inhabitants thereof and the public generally, for a stipulated compensation. It has been at all times, and is by its articles of incorporation and by the laws of New York, Illinois and Indiana, authorized to exercise the power of eminent domain in aid of its business, and is a *quasi* public corporation engaged in state and interstate business, public in its nature, and is now, and for forty years last past has been, operating a line of telegraph from the city of Chicago to and through the city of Hammond, and to a large number of other points throughout the world. It maintains, and has maintained during all of said time, a public office in said city of Hammond, where it receives and delivers messages and news generally to those who may desire and are willing to pay for the same. It does now transmit, and has during said time transmitted, over the wires of its said system, and through its said office at Hammond, and to other points, to all who desired the same, the continuous quotations of the Chicago Board of Trade, and, without inconvenience, or unusual or unnecessary expense, can furnish and deliver the same to the relator Hammond Elevator Company. Said board of trade is a corporation organized under special charter granted by the state of Illinois, February 18, 1859, with its principal place of business in the city of Chicago, and organized, among other things, for the purpose of maintaining a commercial exchange and acquiring and disseminating commercial and economic information, and securing to its members the privileges of coöperation, and generally for the carrying on of any business usually conducted by boards of trade or chambers of commerce. Said board since its organization has been, and is now, conducting and maintaining an exchange at the city of Chicago, upon which exchange are bought and sold, and contracted to be bought and sold, all kinds of grain and hog products. The prices at which said commodities are so bought and sold, or contracted to be bought and sold, are

collected by said exchange and circulated in the manner hereinafter set forth, and, when so collected and circulated, are known as quotations, and when circulated at intervals of less than fifteen minutes are known as continuous quotations.

Said prices at which said commodities are so bought and sold, or contracted to be bought and sold, are noted by persons placed for that purpose on said exchange, and by them marked down, and then each and every fluctuation in the price of said commodities upon said exchange is immediately transmitted to the telegraph operator on the exchange floor, who at once transmits the same by telegram to said Western Union Telegraph Company in the city of Chicago, which buys the same from said board at a stipulated price per year, for the purpose of disseminating and selling the same to any persons or corporation throughout the United States that may desire the same and pay its fixed price therefor. From its Chicago office by automatic apparatus they are repeated and sent out by said telegraph company over wires run into most of the large cities of the United States, and said continuous quotations are the property of said telegraph company, and are continuously received by it at said city of Chicago, at intervals varying from a few seconds to five minutes, with the fluctuations of said prices, and conveyed to the persons, corporations and exchanges in the several states of the United States within from fifteen to twenty seconds after such prices or fluctuations of prices are made in the course of such purchases and sales on said exchange, and are thus supplied by said telegraph company to persons, corporations and exchanges, and to the public generally, upon the payment to it of a regulation charge for the same. Said telegraph company has been engaged in said business of obtaining, disseminating and selling said quotations almost continuously for over ten years last past, and is now so

engaged, and will be so engaged for a long period in the future. Said business is a source of great income and profit to it, and constitutes a large and material part of its business, and has become of such general use and importance to the whole public that the market prices of said commodities are fixed thereby throughout the United States, and such business is a great convenience and benefit to the public generally which has an interest therein. It is essential to said Hammond Elevator Company, in order successfully to carry on its said business, to receive said continuous quotations at said city of Hammond. On November 12, 1903, at said city of Chicago, said elevator company requested and demanded said continuous quotations from said telegraph company, and offered to pay for the same the regular and fixed charge therefor, and abide by, perform and observe all proper rules and regulations which it might legally require. Said telegraph company then and there refused to furnish said elevator company with said quotations, and has ever since failed and refused to furnish said continuous quotations, and will continue so to do unless mandated in this proceeding. Such refusal was not made on the ground of any failure of said elevator company to make tender of the regular charge, nor of its failure to comply with, perform and observe any rules or regulations, but, on the contrary, such tender, and the performance and observance of such rules and regulations were at all times, and are, wholly waived by said telegraph company. Said elevator company was on said date, has been since, and is now, able and willing to pay the regular charge for said continuous quotations, and has been, is now, and ever will be, willing and able to comply, abide by, perform and observe all rules and regulations of said telegraph company that it now has or hereafter may have a legal right to enforce or impose. Said regular charge above mentioned varies for different localities, being regular as to any given locality, but that said

elevator company on November 12, 1903, did not know and does not now know the specific, regular charge of said telegraph company for said continuous quotations delivered at Hammond, Indiana, and said elevator company herewith and hereby offers to pay for said continuous quotations the regular charge for the same at said city of Hammond, and to comply with any reasonable regulations of said telegraph company in that connection.

Appellant demurred to this complaint upon the grounds: (1) That the board of trade was a necessary party respondent; and (2) that said complaint did not state facts sufficient to constitute a cause of action.

The first ground of demurrer is waived by silence.

Appellant's counsel insist that a telegraph company is not a common carrier with respect to the purchase and sale of news, and that the facts alleged in the complaint are insufficient to impose upon appellant a legal duty to supply appellee elevator company with said market quotations.

It is a familiar principle of law that a common carrier, while in the enjoyment and exercise of its franchise, must serve the public, so far as it is able to do so, with 2. substantial impartiality and without invidious discrimination. *Central Union Tel. Co.* v. *Bradbury* (1886), 106 Ind. 1; *Indiana, etc., Gas Co.* v. *State, ex rel.* (1902), 158 Ind. 516, 57 L. R. A. 761; *Indiana, etc., Oil Co.* v. *State, ex rel.* (1904), 162 Ind. 690.

The mere purchase and sale of news by a telegraph company may not constitute it a common carrier of such news so as to invest the general public with an equal right 3. to the same, but "when the owner of property devotes it to a use in which the public has an interest, he in effect grants to the public an interest in such use, and must, to the extent of that interest, submit to be controlled by the public, for the common good, as long as he maintains the use." *Munn* v. *Illinois* (1876), 94 U. S. 113, 24 L. Ed. 77; *Inter-Ocean Pub. Co.* v. *Associated Press* (1900),

184 Ill. 438, 56 N. E. 822, 75 Am. St. 184, 48 L. R. A.
568; *Hockett* v. *State* (1886), 105 Ind. 250, 258, 55 Am.
Rep. 201.

It appears from the averments of the complaint that for
a period of ten years appellant, in the exercise of its charter
rights, and in conjunction with its other business,
was engaged in buying the continuous quotations of
prices of grain and hog products of the board of
trade of Chicago, and selling the same at a fixed price to
such persons as desired them, until such quotations became
necessary to the safe and successful conduct of business in
such products, and such quotations and this method and
system of gathering and supplying the same became im-
pressed with a public interest. Conceding these facts to be
true, as the demurrer does, so long as appellant, a *quasi*
public corporation, continues in such business, it must be
subject to such regulations as may be found necessary to
prevent injury to such public interest. The law will not
permit a telegraph company under such circumstances to
enjoy a monopoly, and to misuse its franchise by supplying
such quotations to some and refusing them to others who
are equally able and willing to pay for them and to be gov-
erned by all reasonable rules and regulations. The facts
alleged in the complaint make it plain that it was the duty
of appellant to supply appellee elevator company with the
continuous quotations of the board of trade of Chicago,
without discrimination, and upon the same terms exacted of
others. *New York, etc., Exchange* v. *Chicago Board of
Trade* (1889), 127 Ill. 153, 19 N. E. 855, 11 Am. St. 107,
2 L. R. A. 411; *Inter-Ocean Pub. Co.* v. *Associated Press*
(1900), 184 Ill. 438, 450, 56 N. E. 822, 48 L. R. A. 568,
75 Am. St. 184; *Friedman* v. *Gold, etc., Tel. Co.* (1884),
32 Hun 4; *Nebraska Tel. Co.* v. *State, ex rel.* (1898), 55
Neb. 627, 76 N. W. 171, 45 L. R. A. 113; *State* v. *Citizens
Tel. Co.* (1901), 61 S. C. 83, 39 S. E. 257, 85 Am. St.

870, 55 L. R. A. 139; *Smith* v. *Gold., etc., Tel. Co.* (1886), 42 Hun 454. No error was committed in overruling appellee's demurrer to the amended complaint.

The second paragraph of answer or return of appellant alleged: That it is a New York corporation, with charter power to conduct a telegraph business throughout the United States, and therein to transmit all messages from time to time tendered to it, and to engage in the business of buying and selling news; that on June 5, 1867, it filed with the postmaster-general of the United States its written acceptance of the restrictions and obligations of the act of congress, approved July 24, 1866 (14 Stat. at Large, p. 221), entitled "An act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes;" that under said act of congress it has constructed its lines along the various public railroads running across Indiana into Ohio and other states, and the telegraph wires so running through Indiana connect with and extend beyond the terminal lines of said railroads over other railroads and post-roads, and that appellant has offices for its telegraph business at Washington, D. C., and in all the principal cities, towns and villages of the United States; that all said railroads are public highways and post-roads; that prior to the commencement of this suit appellant was engaged in the business of sending and receiving messages for the public over said lines between its different offices within and without the State of Indiana, and from its offices in one state to its offices in another state, and in sending telegraphic communications between the several departments, officers and agents of the government, said official telegrams being transmitted at rates fixed by the postmaster-general annually; that the telegraph business so conducted is interstate, and is being conducted under said act of congress; that an essential requisite in the telegraph business is the maintenance of the inviolability of the news transmitted, including the right

of those sending said messages over such wires to designate the persons to whom the same should be delivered, and to confine the giving of such messages and information to the persons so designated, and that any order of court compelling respondent to furnish such news or messages to any person not so designated would be an obstruction and interference in the conduct of said interstate business, and would deter persons, otherwise availing themselves of the facilities of respondent, from committing such information to it for transmission, and that, if the court in this cause should order respondent to furnish said quotations in violation of the contract with the board of trade, under which respondent receives them, it would obstruct and interfere with the interstate commerce business, so far as it respects the transmission of said quotations, and, by compelling the respondent to break its said contract, respondent would be deprived of such quotations and of the opportunity of transmitting them to sundry persons located throughout the different states of the Union, and that this would be contrary to the scope, purpose and spirit of the act of congress and the Constitution of the United States.

A contract, dated April 15, 1901, between the Chicago Board of Trade, respondent, and the Western Union Telegraph Company and the Postal Telegraph Cable Company is then set out in full. This contract is lengthy, and need not be here set out in its entirety. It first provides that the board of trade shall collect the quotations upon its exchange and transmit them over a telegraph wire to the offices of these two telegraph companies in Chicago with due promptness and dispatch; and "Second. Said parties of the second and third parts agree that they will not knowingly furnish or sell, directly or indirectly, said continuous quotations to any person, firm or corporation conducting a bucket-shop, or other similar place, where such quotations are used as a basis for bets or other illegal contracts based upon the fluctuations of the prices of commodities dealt in on said board

of trade, nor will they knowingly continue to furnish said continuous quotations to any person, firm or corporation who shall retransmit or furnish the same to any person, firm or corporation conducting such bucket-shop or other place; provided, however, that nothing in this contract shall be construed as imposing upon said parties of the second and third parts the duty to investigate and determine the character of business conducted by any person, firm or corporation applying for or receiving such continuous quotations, but the procedure to be adopted for the purpose of determining whether any applicant for such continuous quotations, or any person, firm or corporation receiving said quotations, contemplates using them for any of the prohibited purposes aforesaid, shall be as follows: (1) Every applicant for such continuous quotations shall sign in duplicate an application in writing as follows: 'To the ——— ——————— Telegraph Company: We hereby apply to you for the continuous market quotations of the Chicago Board of Trade, and we represent and agree with you, and with the board of trade of the city of Chicago, from which you, under contract, have acquired the right to distribute said quotations: I. That our business is and shall be the business of ——————————————, and that we are not keeping or causing to be kept, and will not keep or cause to be kept, any bucket-shop, or any office, store or other place wherein is conducted or permitted the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any grain, provisions or other commodity or property, wherein both parties thereto or the undersigned contemplate. or intend that such contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according or with reference to the public market quotations of prices made by any board of trade or exchange upon which the commodities or securities referred to in said

contracts, agreements, trades or transactions are dealt in, and without a *bona fide* transaction on such board of trade or exchange, or wherein both parties or the undersigned shall contemplate or intend that such contracts, agreements, trades or transactions shall be or may be deemed closed or terminated when the public market quotations of prices made on such board of trade or exchange for the articles or securities named in said contracts, agreements, trades or transactions shall reach a certain figure; and we agree that we will not use, or allow anyone else to use, such quotations, or any of them, for any such purpose or in such bucket-shop. II. * * * That said quotations are to be received by us only for our private and individual use, and that said quotations will be used only in our said business. * * * III. We further agree that a strict compliance with the above provisions is and shall be a condition precedent to our right to a continuance of said quotations.' One of such applications so signed shall be by the telegraph company mentioned therein at once transmitted to the party of the first part at Chicago, which shall thereupon instigate such investigation as it deems proper to determine whether such applicant desires said quotations for said prohibited purposes."

The expression "continuous quotations" was defined as meaning every service of quotations wherein the price of any commodity shall be quoted oftener than at intervals of ten minutes. It was further stated that the intent and purpose of the agreement was to prevent the misuse of said quotations for said unlawful purposes or in said unlawful business, and not to discriminate between persons desiring them for other than said prohibited purposes. The agreement was to remain in force for one year, and thereafter until terminated by notice, and provided for the payment of a consideration of $2,500 per month by each of said telegraph companies.

This paragraph of answer must be held insufficient. The body of the pleading does not set out the tenor of the contract exhibited, nor declare its effect upon the performance of the service required of appellant by the alternative writ of mandate. Proper practice requires the pleader to state the facts growing out of the writing exhibited upon which he relies as constituting a cause of action or defense. *Deane* v. *Indiana Macadam, etc., Co.* (1903), 161 Ind. 371; *Cole* v. *State, ex rel.* (1892), 131 Ind. 591. No legal or sufficient defense to the allegations of the writ is made to appear by this paragraph of answer, and appellee's demurrer to the same for want of facts was rightly sustained.

The third paragraph of answer avers that the Chicago Board of Trade is a private corporation organized under a special charter granted by the state of Illinois, and that its objects are "to maintain a commercial exchange, to promote uniformity in the customs and usages of merchants, to inculcate principles of justice and equity in trade, to facilitate the speedy adjustment of the business disputes, to acquire and disseminate valuable commercial and economic information, and, generally, to secure to its members the benefits of coöperation in the furtherance of their legitimate pursuits;" that it is given charter power to hold property of all kinds, and dispose of the same by sale and otherwise, and generally to do and carry on any business that is usually conducted by boards of trade or chambers of commerce; but that said charter does not impose on said board the duty of furnishing to the public, or any person whatsoever, the knowledge of quotations of prices made in transactions between its members in its exchange hall; that it has 1,800 members, and that the cost of maintaining itself is $240,000 a year, and that it has for many years provided in Chicago an exchange building, and therein an exchange hall, where its members meet every business day to buy and sell for themselves, or as brokers for their customers, for present

and future delivery, all kinds of grain and hog products; that such transactions are by open *viva voce* bidding, and the knowledge of prices there made are a species of property of large value to the board of trade; that the quotations are collected in said exchange hall by employes of the board of trade, and are by them transmitted to respondent, and are by it transmitted automatically to its customers throughout the United States; that prior to June 1, 1900, the board of trade permitted respondent to collect such quotations and to transmit the same to others without restrictions, at which time said board claimed that the indiscriminate distribution of the quotations had resulted in their use by bucket-shops, to the discredit, prejudice and financial injury of the board and its members, and terminated the license of appellant to collect said quotations, and required it to enter into the agreement in writing aforesaid, which was executed about April 15, 1901, and which is set out in full in this paragraph; that since said date respondent has been receiving said quotations under said contract and distributing the same as therein specified, and that, if this respondent were to furnish said quotations otherwise, or to any person not signing an application therefor, as provided in said contract, such action would constitute a breach by respondent of said contract, and that by reason thereof the board of trade could, and, as respondent verily believes, would, terminate said contract, thus depriving respondent and its customers throughout the country of said quotations; that the Hammond company has never tendered to respondent or the board of trade any application signed by it in the form set out in said contract, but insists that, without its signing such an application, it is entitled to receive, and respondent is required to furnish to it, such quotations.

The fourth paragraph of answer contains the same averments as to the incorporation, powers, exchange hall, members, collection and distribution of the quotations of the Chicago Board of Trade, the loss of said quotations by the

respondent on August 1, 1900, and the execution finally of the contract of April 15, 1901, as are contained in the third paragraph above. This contract of April 15, 1901, is also set out *in extenso* in this paragraph. It then alleges: That since said last-mentioned date respondent has been receiving the quotations and distributing the same as provided in the contract, but not to any person not signing an application as therein provided, and that the compelling of respondent to furnish the quotations to petitioner, or any other person not signing an application therefor, would constitute a breach of said contract of April 15, 1901, and would result in respondent and its many customers being deprived of the quotations; that respondent transmits the quotations over wires running from Chicago across Indiana, and that it is not now, and has not been since April 15, 1901, transmitting said quotations to any person in Indiana; that said Hammond company is engaged at Hammond, Indiana, in conducting a bucket-shop, and desires the quotations sought under this writ for the purpose of conducting a bucket-shop and using said quotations therein; that said Hammond company was, at the institution of this suit, and for some time prior thereto had been, engaged in purloining said quotations, or receiving them from others known by said Hammond company to be purloining them, and that said company has been during said time using said quotations in conducting a bucket-shop.

The fifth paragraph of answer avers: That the Hammond company at the time it demanded said quotations and filed its petition herein, was engaged at Hammond in making bets on the fluctuations of the prices, and conducting a bucket-shop, and desired the quotations sought in this proceeding for the purpose of conducting a bucket-shop and gambling therein, in violation of the laws of Indiana, and for no other purpose, and that the Hammond company was, at the institution of this suit, and for some time prior thereto had been, engaged in purloining said continuous

quotations, or receiving them from others known by said Hammond company to be purloining the same, and, during said time had been using said purloined quotations in conducting a bucket-shop as aforesaid.

The sixth paragraph of answer avers many of the facts contained in the other paragraphs, and concludes with the allegation that the board of trade is a necessary party defendant to the petition, and that without its being so the full determination of the question involved can not be made, and the writ would be unavailing.

Appellant's counsel contend that the last paragraph states a cause of defense in bar of the writ, because of a defect of parties. This position is untenable, and upon that theory there was no error in sustaining appellee's demurrer to this paragraph of return. A defect of parties not apparent on the face of the complaint must be set up by a verified plea in abatement, filed and tried before answers in bar are pleaded. §368 Burns 1901, §365 R. S. 1881; *Carmien* v. *Cornell* (1897), 148 Ind. 83; *Moore* v. *Harmon* (1895), 142 Ind. 555; *Watts* v. *Sweeney* (1891), 127 Ind. 116, 22 Am. St. 615; *Sheridan Gas, etc., Co.* v. *Pearson* (1898), 19 Ind. App. 252, 65 Am. St. 402.

While the third, fourth and fifth paragraphs of answer are not identical, yet they are all addressed to the same general subject, the right of the board of trade to require an applicant to sign a statement binding himself not to use such quotations in conducting a bucket-shop, and to refuse to supply them to one engaged in a bucket-shop business. Appellee's counsel vigorously assail these paragraphs of answer, but many of their objections have been answered by the Supreme Court of the United States in the case hereinafter cited. It is insisted that the allegations with regard to option gambling consist of inferences, conclusions and epithets, and as such are not sufficient. In addition to the allegation of facts, with more or less particularity, it is alleged that relator Hammond

Elevator Company is engaged in conducting a bucket-shop. This contract, upon which these paragraphs of answer are founded, prohibits appellant from supplying market quotations to "bucket-shops" by that name, and this term has a well-known meaning, and is defined by the Standard Dictionary as "An office where people may gamble in fractional lots of stocks, grain, or other things which are bought and sold on the exchanges. The bucket-shop uses the terms and outward forms of the exchanges, but differs from exchanges in that there is no delivery, and no expectation or intention to deliver or receive securities or commodities said to be sold or purchased." The definition given in the Century Dictionary is as follows: "An establishment conducted nominally for the transaction of a stock-exchange business, or a business of similar character, but really for the registration of bets or wagers, usually for small amounts, on the rise or fall of the prices of stocks, grain, oil, etc., there being no transfer or delivery of the stocks or commodities nominally dealt in."

We have no statute denouncing option gambling as a crime, but contracts for the purchase and sale of commodities, not to be delivered, but only to be performed by advancing and paying differences, are void at common law, in the absence of statute. *Irwin* v. *Williar* (1884), 110 U. S. 499, 4 Sup. Ct. 160, 28 L. Ed. 225; *Rumsey* v. *Berry* (1876), 65 Me. 570; *Gregory* v. *Wendell* (1878), 39 Mich. 337, 33 Am. Rep. 390; *Mohr* v. *Miesen* (1891), 47 Minn. 228, 49 N. W. 862; *Cunningham* v. *National Bank* (1883), 71 Ga. 400, 51 Am. Rep. 266; *Cothran* v. *Ellis* (1888), 125 Ill. 496, 16 N. E. 646. This court has denounced such practices in the strongest terms: "The business or operations of the 'bucket-shop' have been the source of much evil. Embezzlements and other crimes on the part of public officers, and bank officials, having the custody of money belonging to others, have been in the past some of the evil fruits directly

traceable to dealing in futures in these institutions; and the question of prohibiting such transactions or business, as it is generally conducted, merits the consideration of the legis-. lature." *Pearce* v. *Dill* (1897), 149 Ind. 136, 144; *Plank* v. *Jackson* (1891), 128 Ind. 424; *Davis* v. *Davis* (1889), 119 Ind. 511; *Sondheim* v. *Gilbert* (1889), 117 Ind. 71, 5 L. R. A. 432, 10 Am. St. 23; *Whitesides* v. *Hunt* (1884), 97 Ind. 191, 49 Am. Rep. 441.

The requirement of the board of trade that every applicant for its continuous quotations shall, as a condition precedent to receiving them, obligate himself not to use 9.      the same for such illegal purposes, is not an unlawful discrimination meriting the condemnation of the court, but, on the contrary, is a proper and reasonable regulation to which this court unhesitatingly gives its approval. *Board, etc.,* v. *Christie Grain, etc., Co.* (1905), 198 U. S. 236, 253, 25 Sup. Ct. 637, 49 L. Ed. 1031; *Central Stock, etc., Exchange* v. *Board, etc.* (1902), 196 Ill. 396, 63 N. E. 740; *Sullivan* v. *Postal Tel. Cable Co.* (1903), 123 Fed. 411, 61 C. C. A. 1.

In the last case cited the court, speaking to this point, said: "The bill, however, shows that the board and telegraph companies had established, as a regulation for the conduct of the business of supplying quotations, a rule that all applicants should sign an agreement in which they covenanted, among other things, not to engage in bucket-shopping. The appellant has failed to comply or to offer to comply with that regulation, and challenges the right of the appellees and the board of trade to require compliance with such a rule. Without deciding, but merely assuming for the sake of argument, as was done in *Illinois Commission Co.* v. *Cleveland Tel. Co.* [(1902), 119 Fed. 301, 56 C. C. A. 205] that the property right of the board of trade is impressed with a public use, and that the board and the appellees, as agencies through which the quotations are distributed, must serve without discrimination all who apply,

there yet remains the right of the board and the appellees to establish reasonable regulations for the conduct of the business. And so the only question is whether or not it is a reasonable regulation to require the applicants to sign the .contract referred to. In the Illinois Commission Company case [*supra*] we held that this was a reasonable requirement."

The writ of mandamus is an extraordinary writ, and, while not discretionary, it will only be issued by a court in the exercise of a sound legal discretion. "It is a remedial process and may be issued to remedy a wrong, not to promote one, to compel the discharge of a duty which ought to be performed, but not to compel the performance of an act which will work a public and private mischief, or to compel a compliance with the strict letter of the law in disregard of its spirit or in aid of a palpable fraud. The relator must come into court with clean hands." *People, ex rel., v. Board, etc.* (1893), 137 N. Y. 201, 204, 33 N. E. 145.

The mischief and evil consequences resulting to the state from the operations of the bucket-shop are almost beyond computation. It assumes an air of legality and respectability, and insidiously ensnares many innocent victims before the public learn of their danger. Its nefarious practices are directly responsible for innumerable bankruptcies, defalcations, embezzlements, larcenies, forgeries and suicides. It ought to be outlawed by statute, as its existence is a menace to society, and its operations immoral, contrary to public policy and illegal. In the case of *Bryant* v. *Western Union Tel. Co.* (1883), 17 Fed. 825, the court very pertinently said: "If 'bucket-shop' means a place where wagers are made upon the fluctuations of the market prices of grain and other commodities, then I think the evidence shows the complainants keep such a 'shop,' and are of the class which defendants are prohibited from furnishing the market quotations of the Chicago Board of

Trade. This is gambling, and a very pernicious and demoralizing species of gambling, which a court of equity should not protect even if the board of trade had not taken the action it has." *Christie Street Com. Co.* v. *Board, etc.,* (1900), 94 Ill. App. 229. See, also, *Smith* v. *Western Union Tel. Co.* (1887), 84 Ky. 664, 2 S. W. 483.

We are unwilling that the board of trade of Chicago should be a more considerate guardian of the morals of this State than its own courts, and, assuming the facts pleaded to be true, unhesitatingly declare that no court, under the guise of requiring the performance of a duty by a public-service corporation, should, either in violation of the contract pleaded or in its absence, compel the performance of acts vitally necessary to the continued operations of a bucket-shop. The third, fourth and fifth paragraphs of answer were sufficient, and the court erred in overruling appellee's demurrers to the same.

The judgment is reversed, with directions to overrule the demurrers to the third, fourth and fifth paragraphs of answer or return to the amended complaint, and for further proceedings in harmony with this opinion.

Gillett, J., did not participate in this decision.