ILLINOIS COMMISSION CO. et al. v. CLEVELAND TEL. CO. et al.

(Circuit Court of Appeals, Seventh Circuit. October 28, 1902.)

No. 846.

**1. TELEGRAPH COMPANIES—PROPERTY RIGHT IN MARKET QUOTATIONS—UNFAIR COMPETITION.**

A telegraph company which by contract with the Board of Trade of Chicago is furnished by such corporation with the continuous market quotations from its exchange, for which the company pays, and which it transmits and distributes to patrons who pay therefor, has a property right in such quotations, which entitles it to protection by injunction restraining others, who are not its patrons, from taking the same from its wires or from the offices of its patrons, and selling or distributing them in competition.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The bill as amended, was by the Cleveland Telegraph Company, a corporation and citizen of the State of West Virginia; and the Western Union Telegraph Company; the Postal Telegraph Cable Company; and the Gold and Stock Telegraph Company, corporations existing under and by virtue of the laws of the State of New York, against appellants, and others, citizens of the State of Illinois. It set forth in substance, the organization of the Board of Trade of the City of Chicago; the general purposes of such Board; its right to make rules, regulations and by-laws, for the government of its affairs; the fact that it has a membership of about eighteen hundred members, and owns an Exchange Building costing upwards of one million dollars; and the manner of its conducting business, the latter as follows: that any person of good character and business integrity can become a member of the said Board of Trade upon application, and paying its regular initiation fee, or acquiring in lieu thereof from a member, a transfer of an existing membership, which is readily purchasable; and that said Board of Trade has provided within such exchange building for the exclusive use of its own members only, an exchange hall, where many of its members meet every business day between the market hours of 9:30 a. m. and 1:15 p. m. (except on Saturday, when the market hours are from 9:30 a. m., until twelve o'clock

noon) to buy and sell for themselves, or as brokers and agents for their customers, for present and future delivery, all kinds of grain and hog products, the volume of said transactions aggregating many millions of bushels of grain and many million pounds of hog products annually, and having become so large that said exchange is now the greatest grain and provision market in the United States; that said purchases are permitted by said Board of Trade to be made, and are made, only during said market hours, and by viva voce bidding; and the information of the prices thus made in said transactions during said market hours upon said Exchange has become a species of property of such large value to the said Board of Trade, that telegraph companies are willing to pay said Board of Trade large sums of money for the privilege of receiving instantaneously said quotations of prices and selling the same to their customers, and many persons throughout the United States who are engaged in the grain and provision business are willing to pay, and for many years have paid said telegraph companies large sums of money therefor; the prices which telegraph companies are able to get from their customers for the instantaneous and continuous quotations of said Board of Trade being as follows:

From Chambers of Commerce outside of the City of Chicago, from $150.00 to $300.00 per month.

From individuals outside of the City of Chicago when furnished by telegraph instrument known as the "Morse" instrument, from $125.00 to $175.00 per month.

From same persons when furnished by instrument known as "Tape Ticker," from $6.00 to $25.00 per week.

From persons in Chicago, $4.00 per week; and for periodic or non-continuous quotations, as follows:

For quotations every fifteen minutes outside of ticker districts, $20.00 per week; for like quotations every thirty minutes, $10.00 per week; for four (4) quotations daily from $10.00 to $20.00 per month, depending on the number of articles quoted.

The bill further states the manner of collecting and distributing said quotations, as follows:

Experienced persons are placed during market hours, in each of the different parts of the exchange hall of said Board of Trade where the buying and selling of the different commodities is taking place—these parts being commonly known as "pits"—whose duty it is to at once mark on paper every fluctuation in the market price of the commodity dealt in in such pit, and to immediately transmit said written prices by messengers to a telegraph operator on the floor of said exchange hall, who at once transmits them by a certain electrical instrument called a "transmitter" over telegraph wires connected with said transmitter, and running thence to the various offices and places of business of persons in the city of Chicago, who desire, and are willing to pay for, such quotations, each of such wires being connected in said office with an electrical instrument known as a "ticker" by means of which the quotations which are thus electrically transmitted over such wires to said ticker, are automatically and immediately printed upon an automatically unrolling roll of paper called a "tape," so that persons in said offices can read the same on said tape within less than fifteen seconds after such prices are made in transactions upon such exchange; and such quotations are transmitted to persons outside of the City of Chicago in a similar manner, except that they are required to be and are almost instantaneously retransmitted over telegraph wires by means of a telegraph instrument known as a "Morse" instrument, this retransmission being necessary in order to send such quotations any considerable distance, and by the method herein indicated said continuous quotations can be conveyed to persons in all the cities and towns of the United States within twenty seconds after said prices are made in said transactions of said exchange; and your orator is informed and believes that the yearly expense to said Board of Trade of collecting said quotations as aforesaid, is more than seven thousand dollars ($7,000.00).

The bill then sets forth the following agreement:

This Agreement, Made this 15th day of April, 1901, between the Board of Trade of the City of Chicago, a corporation, organized under the laws of.

the State of Illinois, party of the first part, and The Western Union Telegraph Company, a corporation organized under the laws of the State of New York, party of the second part, and the Postal Telegraph Cable Company, a corporation organized under the laws of the State of New York, party of the third part,

Witnesseth: First. The said Board of Trade agrees to furnish, without discrimination or delay, to the said party of the second part and said party of the third part, complete and continuous quotations of prices made in transactions between members of said Board of Trade in its Exchange Hall. Such quotations shall be received by each of said telegraph companies at its office or offices in the City of Chicago, over a wire or wires to be furnished by the said telegraph company, connecting its office or offices with Morse telegraph wire or wires in the exchange building of the said party of the first part, which shall run to and be connected with the Morse telegraph transmitting instrument upon the floor of said exchange; such transmitting instrument to be the only instrument by which such quotations are to be transmitted from the said exchange hall. Said market quotations shall be collected in the different parts of said exchange hall and be brought to the Morse telegraph operator at said transmitting instrument with as much speed, efficiency and completeness as they were prior to June 22, 1900, collected by the said parties of the second and third parts; and shall be transmitted by said operator with the same diligence, promptness and completeness as the same were prior to June 22, 1900, transmitted by the said parties of the second and third part; the operator, Morse telegraph transmitting instrument and wires leading to the various telegraph companies, parties hereto, to be located at the wheat pit, and within reach of the wheat reporter, said operator to be satisfactory to the telegraph companies. The said party of the first part agrees to employ or cause to be employed, without expense to the party of the second or of the third part, a sufficient number of competent persons for the purpose of collecting and transmitting the said quotations of sales upon said exchange hall, including the necessary force of messengers for carrying said quotations and reports to the transmitting operator, so that the parties of the second and third part shall obtain complete and continuous quotations throughout all sessions of said Board of Trade of the prices at which commodities dealt in on said exchange are bought and sold. The party of the first part agrees that the intention of this clause is to insure that the delivery of its quotations to the parties of the second and third parts hereto shall be simultaneous with and in the same manner as their delivery to any other telegraph company or party to whom they may be furnished for distribution. And said Board of Trade further agrees that said telegraph companies may designate some person of good character and proper behavior to take from the blackboard in said exchange hall, as the same is posted there, all market and statistical information which is posted on said blackboard, and that such person shall have a permit to enter said exchange hall for that purpose.

Second. The said parties of the second and third parts agree that they will not knowingly furnish or sell, directly or indirectly, said continuous quotations to any person, firm or corporation conducting a bucket shop, or other similar place, where such quotations are used as a basis for bets or other illegal contracts based upon the fluctuations of the prices of commodities dealt in on said Board of Trade; nor will they knowingly continue to furnish said continuous quotations to any person, firm or corporation who shall retransmit or furnish the same to any person, firm or corporation conducting such bucketshop or other place; provided, however, that nothing in this contract shall be construed as imposing upon the said parties of the second and third parts the duty to investigate and determine the character of business conducted by any person, firm or corporation applying for or receiving such continuous quotations, but the procedure to be adopted for the purpose of determining whether any applicant for such continuous quotations, or any person, firm or corporation receiving said quotations, contemplates using them, or is using them, for any of the prohibited purposes aforesaid, shall be as follows:

1. Every applicant for such continuous quotations shall sign in duplicate an application in writing as follows:

"To the ..................... Telegraph Company:

We hereby apply to you for the continuous market quotations of the Chicago Board of Trade, and we represent and agree with you, and with the Board of Trade of the City of Chicago, from which you, under contract, have acquired the right to distribute said quotations—

I. That our business is and shall be the business of ......................
......................... and that we are not keeping or causing to be kept, and will not keep or cause to be kept any bucket-shop, or any office, store, or other place wherein is conducted or permitted the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any grain, provisions or other commodity or property, wherein both parties thereto or the undersigned contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be, closed, adjusted, or settled according or with reference to the public market quotations of prices made on any Board of Trade or Exchange upon which the commodities or securities referred to in said contracts, agreements, trades or transactions are dealt in, and without a bona fide transaction on such Board of Trade or Exchange, or wherein both parties or the undersigned shall contemplate or intend that such contracts, agreements, trades or transactions shall be or may be deemed closed or terminated when the public market quotations of prices made on such Board of Trade or Exchange for the articles or securities named in said contracts, agreements, trades or transactions shall reach a certain figure; and we agree that we will not use or allow anyone else to use such quotations or any of them for any such purpose or in such bucket-shop.

II. We further agree with you, and with the said Board of Trade of the City of Chicago, that said quotations are to be received by us only for our private and individual use, and that said quotations will be used only in our said business; and that we will not sell or communicate or otherwise give said continuous quotations to any news distributing company, or telegraph company, or other person or corporation, nor allow any person or corporation whatsoever to take, directly or indirectly, said continuous quotations from said office, or to make a wire connection with the instruments or wires in said office over which we receive said quotations. But nothing herein shall preclude us from transmitting said quotations to any branch office of ours, nor to any of our correspondents, provided that before transmitting said continuous quotations to any such correspondent we first obtain in duplicate (one of which shall be at once delivered to said Board of Trade) an agreement signed by such correspondent, in which said correspondent shall agree with you, and with said Board of Trade, to abide by and comply with Clauses I, II and III hereof. If the undersigned shall transmit, or permit to be transmitted, said quotations to any person, firm or corporation, who shall not have first signed a correspondent's agreement as above provided, the undersigned hereby agrees that said Board of Trade may sue the person, firm or corporation to whom said quotations are thus transmitted, to prevent the receipt or use of said quotations by said person, firm or corporation without making the undersigned a defendant thereto; provided the undersigned does not, or in case of a partnership, all the members thereof do not, reside within the jurisdiction of the court in which said suit is brought. By 'continuous quotations' in this clause II is meant quotations wherein the price of any commodity shall be quoted oftener than at intervals of ten minutes.

III. We further agree that a strict compliance with the above provisions is and shall be a condition precedent to our right to a continuance of said quotations; and agree if we shall violate either of the above provisions, then you shall have the right at once and without notice, to cut off and cease furnishing said quotations.

We further agree with you that you shall not be pecuniarily liable for the accuracy of the quotations which you may furnish under this application, nor for errors, delays or omissions in the service.

This application shall become a contract binding upon us when accepted by you."

One of such applications so signed shall be by the telegraph company mentioned therein at once transmitted to the party of the first part at Chicago,

which shall thereupon instigate such investigation as it deems proper to determine whether such applicant desires said quotations for said prohibited purposes. Such investigation shall in the case of applications made and delivered to the party of the first part, within thirty days after the date hereof, be completed within sixty days after the date hereof; and when so received after said thirty days, said investigation shall be completed within ten days after such receipt of said application. If said party of the first part shall not within the time above specified notify said telegraph company at its office in Chicago that, for the reasons aforesaid, said application should not be granted, then said application shall be accepted and said telegraph company may thereupon furnish said applicant said quotations; but if within said time said party of the first part shall find upon investigation, and shall notify said telegraph company, that said applicant wishes said quotations for any of said prohibited purposes, said telegraph company shall refuse to furnish said quotations upon said application. If legal proceedings shall thereupon or thereafter be commenced against said telegraph company on account of any delay in receiving said quotations or such refusal to furnish quotations, said proceedings shall be defended by the party of the first part, which shall, and hereby agrees to, pay all counsel and attorney's fees, costs, charges, damages, fines, penalties and expenses which said telegraph company may be put to or may be made subject to on account of such delay or refusal; and for the purpose of securing the said telegraph company against any such loss, expenses or damages occasioned by such delay or refusal or such legal proceedings, the said telegraph companies shall at all times retain from the compensation hereafter provided the amount of such compensation for the period of six months; and to this end, the first payment provided for under this contract shall not be made until seven months after it shall go into effect, and if at any time either of the said telegraph companies shall be obliged to pay any costs, damages or expenses which shall not be refunded to it by said party of the first part on demand, then the said telegraph companies may pay from the said fund so retained the amount so paid by said telegraph company, and may then retain from the subsequently accruing installments a sum sufficient to make good the amount so paid out from said fund for costs, damages or expenses.

2. If said Board of Trade shall at any time ascertain that any person, firm or corporation receiving said continuous quotations from the party of the second or third part, or from persons to whom either party of the second or third part furnishes said quotations, is using said quotations for the purpose of conducting the business of illegal gambling in any of the commodities dealt in on said Board of Trade, or is conducting a bucket-shop as defined by the law of Illinois, or is violating any of the agreements contained in said application or correspondent's agreement, then said Board of Trade may (1) so inform said telegraph company so furnishing said quotations and tender to said telegraph company its bond, with a surety company in good financial standing as surety thereon running to said telegraph company, and in such penal sum as shall be fixed by said telegraph company, conditioned to save said telegraph company harmless from all costs and damages (including attorney's fees) that may be incurred by said telegraph company by acting upon said information and thereon withholding said quotations from such person, firm or corporation. And thereupon said telegraph company shall at once cease to furnish said quotations to such person, firm or corporation, or if a correspondent, then to the person, firm or corporation whose correspondent he is; and in that event said Board of Trade shall, at its own expense, defend any suits brought against said telegraph company, by reason of its said conduct. Or if said Board of Trade shall elect not to give such bond of indemnity then it (2) may at its own expense, commence legal proceedings in a court of competent jurisdiction against such person, firm or corporation and said telegraph company to enforce this contract and determine whether such person, firm or corporation is using said quotations for such illegal purposes, or is using said quotations in conducting a bucket-shop or contrary to the terms of his, its or their agreement aforesaid; and in such suit said telegraph company shall enter its general appearance as defendant,

and if in said suit or in any suit brought by any such person, firm or corporation against either or both of the telegraph companies, parties hereto, it shall be determined by injunctional order or final judgment or decree conclusive upon the parties to said suit, against the right of such person, firm or corporation to have or use said quotations, then said quotation service to such person, firm or corporation shall be discontinued by said party of the second or third part furnishing the same, and said Board of Trade shall indemnify and save said party of the second or third part harmless against any loss, damage or expenses which may result to it by reason of said discontinuance of said service.

Third. It is further agreed by the said Board of Trade that it will cause to be kept quotation records showing the fluctuations throughout the day with the specific time of said fluctuations in the same manner as said quotation records have been heretofore kept, and that said parties of the second and third parts may at all times have access to said quotation records.

Fourth. The said parties of the second and third parts hereby agree to pay said Board of Trade for said quotations and other market news the sum of twenty-five hundred dollars per month, payable on or before the second day of each succeeding month during which they shall receive said quotations, provided that the first payment shall not be required to be made until seven months after the going into effect of this contract, in accordance with the provisions of clause two of this contract. The proportions of said amount which shall be contributed by each telegraph company to be agreed upon between themselves. Thirty days after the termination of this contract the amount of money withheld by the telegraph companies as a security fund aforesaid shall be paid by them to the party of the first part. Provided, that if there are then pending any suits or claims against either of said telegraph companies on account of its refusal to furnish or continue furnishing said quotations, then the parties of the second and third parts shall have the right to retain a sufficient amount of said fund to amply secure them against said suits and claims, and on the final adjudication or settlement of said suits and claims the amount withheld as security therefor shall be paid by the second and third parties to the party of the first part. But if said party of the first part shall give to the parties of the second and third parts a good and sufficient bond ample to protect them against said impending suits and claims, including all costs, damages and expenses, signed by some surety company in good standing and satisfactory to the parties of the second and third parts, then said telegraph companies shall pay the balance of said fund to the first party.

Fifth. The said party of the first part shall designate as parties of the second and third parts some officer of said Board of Trade to whom said telegraph companies, or either of them, shall apply for the correction of any faulty or inefficient service in the gathering, reporting or transmission of said quotations; or for any necessary change in said service and to whom said telegraph companies, or either of them may refer in case of any dispute which may arise as to the correctness of said quotations, and to whom said telegraph companies, or either of them, may apply touching any incidental question arising on account of said quotation service.

Sixth. Said party of the first part agrees to use all reasonable efforts to protect its property right in said quotations against purloiners thereof, and said telegraph companies agree that they will join either with said party of the first part or other telegraph company having the right to distribute said quotations, or both, as plaintiffs in any suit now pending or hereafter commenced, to protect said property right in said quotations from purloiners, provided that said telegraph companies shall be saved harmless by said party of the first part from any expense, costs, attorney's fees and damages incurred in or by reason of any such suit.

Seventh. Each of said parties of the second and third parts agrees that it will, whenever requested by said party of the first part, furnish to it a list of the persons who have discontinued said continuous quotations, to the end that said party of the first part may at all times know the names, locations and street addresses of all persons, firms or corporations then receiving said continuous quotations.

Eighth. It is further agreed that said telegraph companies may furnish said quotations to any other telegraph company with which either of them now have or may hereafter have any operating contract or any other arrangements, provided that every such. telegraph company shall first sign a contract or agreement, running to said party of the first part, to abide by and conform to clauses two, six, seven and ten of this agreement.

Ninth. And the said party of the first part hereby agrees that it has not entered into and will not enter into any contract or arrangement with any other person or company who has or may acquire the right to distribute said quotations, in which contract or arrangement the said party of the first part has agreed or shall agree to pass upon applications of persons applying for the quotation service in a shorter period than those above provided for in the second clause of this contract. And it is further agreed that in passing upon applications for said quotation service presented by either of the second or third parties it will act without discrimination as between said second or third parties, or as between either of them, and any other person or corporation sending in applications for its patrons. And whenever the said party of the first part shall have before it at the same time applications from the same person, firm or corporation presented through two or more persons, telegraph, telephone or ticker companies, if it approves any of said applications, it shall approve them all at the same time and shall notify at the same time all of said persons or companies through whom said applications were presented of such approval. This shall apply either when an application is approved affirmatively or by the failure of the said party of the first part to act upon any application.

Whenever either party of the second or third parts shall obtain and deliver to the party of the first part an application for the quotation service from any person, firm or corporation, who at the time of making said application is receiving said quotations with the approval of said first party, then the party of the second or third part may furnish said quotations on said application without waiting for an approval by the party of the first part as hereinbefore provided in other cases.

Tenth. The words "continuous quotations" wherever used in the second and eleventh sections hereof shall be construed to mean every service of quotations wherein the price of any commodity shall be quoted oftener than at intervals of ten minutes. Each of said telegraph companies agrees not to furnish said continuous quotations to any person, firm or corporation, except as provided in sections two and eight hereof, the only intent and purpose hereof being to prevent the misuse of said quotations for said unlawful purposes, or in said unlawful business, and not to discriminate between persons desiring them for other than said prohibited purposes.

Eleventh. This agreement shall be in force for one year from the date hereof and thereafter until the first party shall give to said second party and third party, or said second party and third party shall give to said first party, sixty days written notice of its or their intention to terminate the same.

In witness whereof, the parties hereto have hereunto affixed their signatures and corporate seals, the day and year first above written.

Board of Trade of the City of Chicago,<br>By William S. Warren,<br>President.

[Seal.]
Attest:
Geo. F. Stone,
    Secretary.

The Western Union Telegraph Company,<br>By Thos. F. Clark,<br>Vice-President.

[Seal.]
Attest:
A. R. Brewer,
    Secretary.

Postal Telegraph-Cable Company,<br>By W. H. Baker,<br>Vice-President and Gen'l M'gr.

[Seal.]
Attest:
Chas. P. Bruch,
    Ass't. Secretary.

(Endorsed on back) Filed Aug. 5, 1901.  S. W. Burnham, Clerk.

A like agreement was made with the Cleveland Telegraph Company.

The bill then charges appellants with having entered into a conspiracy to steal such quotations, either as the same were transmitted over the Telegraph Companies' wires to their customers, or from the offices of said customers when said quotations are received; and asks for an injunction restraining appellants from obtaining, receiving, selling or distributing such quotations, and for other and further relief. Affidavits were filed, showing that the appellants obtained the quotations after the same were taken from the wires by the patrons of the Telegraph Companies, and written upon their blackboards for the use and information of such people as came into their offices.

The motion for a temporary injunction was heard in the Circuit Court, upon demurrer to the bill, and affidavits; resulting in an order restraining appellants, their respective officers, directors, agents and employees, until the further order of the court, from obtaining, receiving, selling or distributing the market quotations of the Board of Trade of the City of Chicago; and from aiding, abetting or assisting others in the taking or selling, or distributing, of such quotations. From this order the appeal is prosecuted.

Frank F. Reed, for appellants.

Henry S. Robbins, for appellees.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

GROSSCUP, Circuit Judge, after stating the facts as above, delivered the opinion of the Court:

The real questions presented on this appeal we decided in National Telegraph News Co. v. Western Union Tel. Co., 119 Fed. 294. Neither in this case, nor in the one cited, do we decide that the Telegraph Company is not a common carrier of news; that any proposing patron may not have the news upon conforming to the regulations, and the payment of charges, proffered to other patrons; or that the Board of Trade may make an exclusive contract for the transmission of news. None of these questions are material to the judgment to which we have come. The appellants in neither case have brought themselves into a situation where they may claim the service of the Telegraph Company as common carrier, or where they may deny to the Board of Trade its right to make the contract referred to. In this state of the record we are content, on the reasoning of National Telegraph News Co. v. Western Union Tel. Co., to affirm the order below.

Affirmed.