FONOTIPIA LIMITED et al. v. BRADLEY.

VICTOR TALKING MACH. CO. v. SAME.

(Circuit Court, E. D. New York. August 7, 1909.)

1. TRADE-MARKS AND TRADE-NAMES (§ 58*)—INFRINGEMENT—IMITATION.

A red seal or label, containing a trade-mark, placed in the center of a talking machine disc record, is not imitated so as to give the maker a remedy in equity for infringement of trade-mark by reason of the placing by another manufacturer of a label in the same place on his discs, or because it is surrounded by a red band, where it has no other resemblance to complainants'.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 66, 67; Dec. Dig. § 58.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 67*)—UNFAIR COMPETITION—RIGHT TO MAINTAIN SUIT.

The fact that an article is made under a patent, and that the manufacturer might have a remedy against another manufacturer for infringe-

ment of such patent, does not preclude him from maintaining a suit against such manufacturer for unfair competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 78; Dec. Dig. § 67.*

Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

3. INJUNCTION (§ 34*)—SUBJECTS OF PROTECTION—PROPERTY RIGHTS.

Complainants manufacture, under patents, disc records for use in machines for the reproduction of sound containing records of vocal and instrumental music originally rendered by artists of distinction, who receive payments and royalties from complainants. Defendant made and sold records·containing the same songs or music, advertising and claiming them to be duplicates of the originals, equal to them in all respects, and sold at one half the price. Such records were made by taking a matrix from one of the commercial records of complainants from which copies were made. Held, that aside from any question of infringement of trade-mark or imitation of label, or deception of the public, complainants were entitled .to relief in equity by injunction to restrain the sale of such copies as a wrongful appropriation of their property.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 74; Dec. Dig. § 34.*]

4. INJUNCTION (§ 114*)—PARTIES.

To such a suit the artist whose music is reproduced, and who receives a royalty on the number of records sold, is not a necessary or an indispensable party.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 202; Dec. Dig. § 114.*]

5. MONOPOLIES ·(§ 12*)—FEDERAL ANTI-TRUST ACT—CONTRACTS PROHIBITED.

An agreement between competing manufacturers to maintain the prices of their respective products may not be in restraint of trade nor within the prohibition of the federal anti-trust law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

In Equity.

Ralph L. Scott (Philip Mauro and C. A. L. Massie, of counsel), for Fonotipia Limited and Columbia Phonograph Co.

Horace Pettit, for Victor Talking Mach. Co.

Waldo G. Morse, for defendant.

CHATFIELD, District Judge. The present cases have been heard upon a record consisting of pleadings and affidavits presented originally upon a motion for preliminary injunctions and by stipulation made the record and testimony on final hearing. The two actions involve substantially the same principles and can be disposed of together, the slight differences between the positions of the parties, and certain questions peculiar to the allegations of each complainant, being capable of statement and determination in connection with the main issues, which are alike in the two suits.

The complainants at the present time are producing and putting upon the market records of vocal and instrumental music, for use upon machines for the reproduction of sound, and constructed in a form suitable for operation with these records in the flat and circular or disc form described in the patent to Berliner, No. 534,543, Feb-

ruary 19, 1895 (Victor v. Amer. Grapho. Co., 145 Fed. 350, 76 C. C. A. 180), and Jones, No. 688,739, December 10, 1901 (Amer. Grapho. Co. v. Universal Co., 151 Fed. 595, 81 C. C. A. 139). It is unnecessary to consider in detail the machines made by either company, further than to say that those manufactured by the complainant the Victor Talking Machine Company are known generally as the "Victor talking machines," and those put upon the market by the Columbia Company are called "graphophones," and the discs described can be interchangeably used upon either type of instrument.

The discs themselves, as at present made, are of some such substance as hard rubber, and are said to be made by causing the music to be sung or played into a receiving instrument, which records the waves of sound upon a disc properly prepared, which, in turn, by an electroplating process, is used to yield a matrix of metal. From this matrix numberless reproductions, substantially duplicates even in minute details of the original record, are produced by processes perfected by each company, and these reproduced discs, when used upon the talking machine or graphophone, turn back, by means of the diaphragm of the instrument, the lines of the record into sound waves, which are the equivalent of those originally sung or played.

In the case of the Victor Company, the discs sold by it within the United States are plainly marked with notice of the patent, and also with notice that the disc is sold for use only upon a talking machine, for the reproduction of sound. The price at which the discs are to be sold is also printed upon each disc, and the maintenance of this price is made a condition of the sale under license. Thus actual notice is given to each purchaser or user of the Victor Company's discs, of the conditions under which they have been sold, and that the article has to do with a patented product. It also appears that a company was organized in Canada by Berliner, who had previously assigned his patent to the Victor Company, and the Berliner Company, Limited, of Canada, has for a number of years been furnished with matrices of the Victor records, and has put upon the market and sold discs reproduced from these matrices, bearing similar license notices to those used by the Victor Company of this country.

The Fonotipia Limited is a British corporation, and the Columbia Phonograph Company is a corporation organized under the laws of West Virginia; the Fonotipia Limited conducting business in England, and in Italy, Germany, and other places on the Continent of Europe, while the Columbia Phonograph Company carries on its business within the United States.

It appears that both companies produce sound records in disc form, and manufacture and sell the duplicates or commercial records in large quantities. By agreement the Fonotipia Limited has contracted with the Columbia Phonograph Company that the latter should have within the United States and Canada the exclusive right to make, or cause to be made, to use, and to sell discs originally recorded by the Fonotipia Limited in Europe. The Fonotipia Limited furnish matrices for this purpose; the Columbia Phonograph Company paying a royalty therefor according to the number of duplicates manufactured, and in addition paying the royalty to be accounted for to the artist orig-

inally making the record, at the rate of the contract by that artist with the Fonotipia Limited. The Columbia Phonograph Company further agreed not to export any of its records out of the United States or Canada. It also appears that all three of the complainant companies have invested large sums of money in building up their business, and in connection with their business the Victor Company has established a very large plant at Camden, N. J. Each of the companies named has advertised extensively and at great expense.

Particular attention has been called to the trade-mark of the Victor Company, which, both as a trade-mark and as an advertisement, in the shape of a dog listening to the sounds from a talking machine horn, and labeled "His master's voice," has become familiar to the public. The methods employed by all of the complainant companies, the uniform care and excellent reproducing qualities of their products (both machines and records), has educated the public to expect the successful reproduction of music of a high standard of quality in the reproduction, and, as shown by the record, the grade of goods produced by the complainant companies upholds the standards which they have established. The public is protected in its purchases by the evenness and excellence of the output.

In addition to the expense and the rights represented by the business indicated, all three of the complainant companies have entered into separate contracts with individual singers and musicians, and particularly in the case of singers under contracts with the so-called "Grand Opera Companies" of New York, Paris, London, Berlin, Milan, etc. Under these contracts with artists able to command large prices, the initial cost of producing the record is great, and the companies are under an agreement to pay a royalty for each record produced from the original matrix, thus furnishing a continuing contract and expense, of which the benefit is going to the singer.

It may be remarked that the defendant has answered, claiming that each of these singers is a necessary party to this suit, inasmuch as their contracts are affected; but it need only be said that they are neither necessary nor indispensable parties, for the reason that their contracts are entirely dependent upon sales, and they are interested in the present questions only in the sense that their profits would be greater or less as sales increase or diminish. The court must also take into account, in any such matter as the present, not only questions of public policy, but questions of public benefit, and it is evident, from the common use of various forms of talking machines or phonographs and graphophones, that the better class of music is brought within the observation and study of many persons who would have neither time nor opportunity to become familiar with it in other ways. The reproduction of songs by famous singers and artists is both educational and beneficial to the people as a whole, and the court cannot but take notice of the fact that such music has an educational side, and appeals to substantially every one, even though they be unconscious of this result.

The defendant has been connected with the business of selling phonographs and sound producing machines for a number of years. He is shown by the record to be more or less familiar with the busi-

ness and to be at present acting as sales agent for a corporation called the Continental Record Company, which is stated in the papers of incorporation to have its home office at New Baltimore, N. Y. The records show that at New Baltimore no plant or office is maintained, but that the company has a local attorney or representative to comply with the requirements of the law. In New York City the only address shown by the testimony as that of the Continental Record Company is the address contained in a bill for certain discs purchased by a representative of one of the complainants; the general literature of the Continental Record Company giving merely New York City as its location. The address shown upon the bill referred to, No. 147 West Thirty-Fifth street, is an office building occupied by a storage company, and the testimony does not show that any sign or other indication of occupancy by the Continental Record Company is displayed. The defendant Bradley, the agent for this company, claims in his testimony to have no interest in the business of the Continental Record Company except as its selling agent; but all allegations as to the history of the business, the production of the records in question, and the source from which these records were purchased, is dependent upon the testimony and affidavits of Bradley alone, he being the only affiant or witness. We have therefore no more information about the Continental Record Company and its business than that which its selling agent has furnished, and what has been discovered by those investigating on behalf of the complainants as above set forth.

The defendant has been for some months advertising by circular letter and in other ways his ability to sell records of the Continental Record Company, stating in these advertisements that the records are sold at prices not more than half those now charged for the original records. The advertisements claim that the records themselves are pressed upon the very highest class of material finished equal to the original, that the character of the record itself is identical with the original record, and that experts who have listened to samples are unable to determine between the original and the copy. The catalogue contains a statement that the records offered by Bradley are "all duplicates from the original records made by the artists whose names are used herein."

It is apparent from the explanation which has been already made that the commercial records sold by the complainants are copies or duplicates, in the sense that they are made from a matrix or metallic plate, but are in no sense duplicate originals; that is, actually made by the sound waves of the singer at the time of the original song. In this sense the defendant's records, if made from one of the commercial records of the complainants, may be a duplicate in the sense of being an exact reproduction, even to such peculiarities as noticeable marks in the lines upon the disc and in the position and relative location of those marks or lines; but the defendant's records are not duplicates, even in the sense that they are removed from the original singing by but one reproduction from a matrix. The testimony shows that the defendant the Continental Record Company makes its records from commercial discs of the complainants and must pro-

duce a second matrix before the copies can be pressed or stamped. The testimony does not show that the complainants themselves confine their sales entirely to records that have but one matrix between the commercial discs and the original singing; but the testimony does show that the uniformity of the product and the carefulness of construction renders a disc placed upon the market by the complainants substantially equal to the record made at the original singing, and is thus separated from it by but one matrix or reproducing process.

The Victor Company has, in addition to its patents and license system, and to its trade-mark, adopted a design for the center or identifying part of the commercial records, and has made use of a so-called "red seal" to cover the center of its higher grade of records. These centers or seals are made of some foreign substance, applied to the record, containing the labels and notices together with the trade-mark, and are printed in type. The imitation or use of centers or seals calculated or likely to deceive the purchaser into thinking that he was buying these so-called "red seal" or other records, has been enjoined by Judge Lacombe, in the case of Victor Talking Mach. Co. v. Armstrong et al. (C. C.) 132 Fed. 711, and there would seem to be no room for argument about that particular question; but in the present case the same proposition is urged as a basis for an injunction against the defendant by the Victor Company, upon the ground that the so-called "Continental" records have the center label or seal encircled with a red border, and it is urged that the mere use of red, and the general style of placing the seal upon the record, is an attempt to evade the effect of the injunction in the suit above mentioned.

The Fonotipia Limited and the Columbia Company do not urge the same question, inasmuch as they do not charge imitation of any characteristic registered label, but they do urge that the defendant is intentionally offering to the public a disc with a center or label of the same general style and character as those of the Fonotipia Limited and Columbia Company, and which purport to be guaranties of a careful reproduction of the original record, and thus the element of imposing upon the public, or of imitating and appropriating the complainants' property rights, is present, even if the appearance of the label be not an imitation. It need only be said that the use of a red band cannot of itself be deemed an imitation of a red label, where the general style of the design is entirely different. The Victor Company does not seem to have the right to prevent, solely from the standpoint of its trade-mark, the use of a label of any sort affixed to the center of a disc, nor even of a circular label; and the fact that all of the labels are appropriate for use upon sound discs does not give either of the complainant companies right to relief solely from registration of trade-mark.

It would seem to be true, in a sense (and the evidence tending to show likeness between the original records of the complainant companies and the particular records sold by the defendant only accentuates this testimony), that the records put upon the market by the defendant have been made, through some transmutation, from original songs sung under contract by the artist to whom the disc is accredited, and to whom a royalty is being paid by one of the complain-

ants, and with whom the defendant has no contractual or business relations whatever. In such case it is impossible to hold that the public is being deceived in the representation that the original song, from which the matrices and reproductions were derived, was sung by the artist to whom it is accredited. Certain mistakes in labeling are shown; but these are merely evidence of the way in which the work was done, rather than sufficient grounds for decree by themselves. Nor is there sufficient similarity to hold, as has been said, that the discs sold by the defendant are in appearance sufficiently like any other discs of the complainants as to bring them within the case of Victor Talking Mach. Co. v. Armstrong et al., supra.

But a more serious question comes from the testimony offered by the discs presented in the case themselves. If the defendant is selling to customers records reproduced by processes of the Continental Record Company, by means of discs purchased in the market by that company for the purpose, and if he advertises and guarantees to his customers that the Continental records are duplicates equal in all respects, including composition and finish, and that it is impossible to distinguish between the Continental records and those produced by the complainants, we have a question of fact presented in which the public is interested, namely, do the records submitted as evidence in the case lead to any determination upon the question of deception or imitation of the product, and the resultant benefit to the imitator, with corresponding injury to the imitated, by the results of the sales, and by the effect upon future sales if the product of the imitation be unsatisfactory?

It may be argued that the imitation would go out of the market and be removed from interference with the original if the product proved unsatisfactory; but it would seem that business reputation and excellence of product are entitled to some protection from imitations which discourage further use and prove unsatisfactory as a whole, because the result of the sale of such a product must necessarily affect adversely the opinion of the very class of customers which is sought to be enlarged by the sale of a satisfactory product.

A comparison, in order to observe points of similarity between the records put in evidence by the complainants, and made by themselves, with the records produced by the defendant and introduced as purchases from him, leads irresistibly to the conclusion that the material used in the Continental Record Company's discs is greatly inferior, contains imperfections which cause scratchings and irritating sounds, is subject to warp, and is so much softer or destructible in character that the commercial value of the defendant's records is much less than that of the complainant companies' records. Actual comparison of the discs warrants the finding that the Continental records are not in every way the equal, even when played upon the same machine, of the complainants' records, and it is impossible to hold that they are duplicates in the sense that they cannot, in most cases, be distinguished from the genuine, or that the imitation product is the duplicate in the sense of being the equal of the original. The defendant's records do not show the use of as good material in the discs, nor as much durability and freedom from warping as those of the

complainants, and a comparison shows in many instances a dulling or far away effect in the defendant's discs.

But before determining whether the complainants can have any remedy under the doctrine of unfair competition, certain questions must be disposed of, which cannot control, and which will complicate the issue if not separately taken up at the outset. First, the defendant contends that the complainants should be compelled to rely upon their patent rights; and inasmuch as their rights under their patents would prevent infringing, making, and sale of discs of the form in question, if their patents be valid, the defendant attempts to urge the converse of the proposition, and asks the court to dismiss this action on the ground that the complainants have an adequate remedy, not at law, but in equity, for infringement of patent. This would necessitate the finding of an additional proposition, namely, that the complainants are not entitled to a decree based upon the doctrine of unfair competition, if they could accomplish the same results by means of an injunction suit upon their patents; but if they should fail in upholding the validity of their patents or proving infringement, or when their patents expire, we should again be facing the same situation now presented, namely, that the doctrine of unfair competition is claimed by the defendant to be limited to cases in which an intent to deceive can be found, either because of misrepresentations or imitation of the trade-name or outward appearance of the article over which the competition exists, or that some special quality in the nature of the product renders the sale of the competing article unfair competition, such as was shown in the stock-ticker, trading-stamp, or railroad-ticket cases, referred to below. The license system of the complainant companies, as shown by the notices printed upon the discs when sold, is based upon patent rights, and upon the legality of the use of patented articles in order to give the person owning the patent the full enjoyment of the monopoly secured thereby.

It is unnecessary to consider whether every record in existence has been issued subject to such a license, for it is apparent that the records or discs of which the defendant is offering so-called "duplicates" for sale are put upon the market in the United States only under a license, are not manufactured in Canada, in the case of the Victor records, except by the Berliner Company, which also purchases the right to use them under a license, or in Europe, in the case of Columbia records and Fonotipia records, under a similar license system, and that the defendant, as well as the Continental Record Company, has knowledge of this system. In fact, the answer of the defendant, to the effect that the records reproduced by him were purchased out of the United States, is evidence of his knowledge of the existence of the license system in the United States, and, in so far as sales of the defendant's discs might be effected to dealers having knowledge of the license system of the complainants, the question of contributory infringement or of inequitable inducement to violate a contract agreement would immediately present itself, and would render a court of equity more willing to prevent that situation by a decree forbidding the sale of a product which would cause the injuries described.

It is also contended by the defendant that the license agreement

of the Victor Company, and its attempt to restrict or control the retail price at which its records shall be sold, by printing a notice upon its discs that the record is sold only to be retailed at a certain rate, and an agreement which has been entered into between the Victor Company and the Columbia Company, are all in restraint of trade and contrary to the so-called "anti-trust law," forbidding monopolies, enacted by the Congress of the United States, on the 2d day of July, 1890 (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]). But, if we are dealing with a patented product a "monopoly," in the sense of right to control the sale of the product and the price which shall be asked therefor, is admittedly within the legal benefits conveyed to the patentee by the issuance of the patent. Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058. If the patents be disregarded, and the matter be considered as a purely business arrangement, it is impossible to see where any offense against the statute mentioned has been shown. Restriction of competition may not include a fair and reasonable attempt to avoid loss by trade agreements which are aimed to prevent nothing but the cutting of rates below the reasonable expense of production and reasonable profit thereon; nor is a "monopoly," in the sense meant by the statute, merely the complete occupation of a certain field where that occupation does not unfairly exclude other competitors. The fact that a certain person is the only dealer in certain goods may be entirely consistent with a free and unlimited opportunity to every other person to deal in the same goods, and the law of proper demand and supply may result in but one source from which certain things can be secured, without thereby rendering the person supplying these goods liable to the accusation of illegally maintaining a monopoly. A certain intent and certain motives, which need not be discussed at length, must be present to establish the interference with competition and the existence of the monopoly at which the statute above mentioned was aimed and which is included within its provisions. A mere attempt to obtain a fair profit, even by an agreement not to undersell, must be tested by the measure of what would be a fair price under competition, and it must be determined whether the centralization or control of the output is intended to or does accomplish any interference with the free action of independent parties who might compete, or with the securing to the public of all the benefits to which they are entitled, over and above the reasonable cost of production and reasonable profit.

But, as has been already said, the question of imitation of trademark cannot control the present case and we must therefore consider the broad question presented by the issue, namely, whether the taking of property in the shape of valuable ideas and products, by mechanical imitation or reproduction, is susceptible of notice by a court of equity, and whether any remedy therefor can exist apart from the questions of patent, trade-mark, and intentional deception or imitation and deceitful substitution of the product.

The question in the present case depends upon two situations: First, in case it be found that the records from which the defendant's manufacturers have produced their matrices or reproductions were pur-

chased in the United States; and, second (even if relief could be granted in the first case), whether the purchases of those original records out of the United States changes the rights of the complainants to protect their product against sales by the defendant within this country.

The testimony shows that microscopic examination, as well as auricular tests by experts in the employ of the complainant companies, disclose certain marks or irregularities in both the Columbia and Victor discs, which have been introduced in evidence, that are duplicated in the Continental records also in evidence. The correspondence in position, number and relation of these peculiarities is such that it seems to be satisfactorily shown that the Continental records indicated were made by the use of a matrix representing the impression of the actual rendering of the song recorded upon the discs of the complainant companies in evidence. In addition, the erasure of the serial numbers corroborates these questions of identity, and, in the case of one of the Columbia double-faced records, a mistake in the labeled title of the Continental record would indicate that the song had been reproduced from one side, and the label taken from the reverse side of the record actually duplicated and sold in this country by the Columbia Company alone; it appearing that the Fonotipia Limited does not make or sell in Europe any of these double-faced records. This evidence either disproves the contention of the defendant that the Continental records in the instances in question were reproduced from discs purchased in foreign countries, unless they were purchased from individuals rather than dealers; and, whether purchased from individuals or dealers, they were subject to the licenses granted, and the defendant must be held to have actual notice that any record so purchased would be subject, if brought within the United States, or used or sold here, to whatever rights the complainants might have under their patents and license system.

It might be argued from this that the complainants would have a remedy in a specific case, either for infringing use or for other so-called contributory infringement by reason of inducing license violations; but the testimony does not show the defendant Bradley to be a party to any license agreements, and the effect of the testimony is merely to show knowledge on his part of the complainants' rights and to furnish an additional reason in equity why he should not be allowed to use the property of the complainants in an unfair way. There would seem to be no doubt that property rights in connection with material objects may exist, and consist of incorporeal rights to enjoyment of the material object, and that equity will protect such incorporeal rights as property (Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031), and the same principle is involved in all copyright and patent litigation.

We therefore reach the broad question of the power of a court of equity to secure to an individual by injunction the full enjoyment of both corporeal and incorporeal rights in property created by him or at his expense, and capable of a taking by another, where such taking either diminishes or destroys the enjoyment of those rights by the

owner and diverts a part of the enjoyment or profits from the rights to the one complained of.

In the case of Victor Talking Mach. Co. v. Armstrong, supra, Judge Lacombe says:

"The complainant contends that defendants have no right to take the discs which it produced as records of a piece of music specially executed, and reproduce from them duplicates thereof. The novel and interesting question thus presented need not now be discussed."

No case cited and decided strictly upon the question of unfair competition, so far as called to the attention of the court, has ever granted relief in instances outside of imitation or deception, and where the public would be likely to be misled by the points of similarity involved; but equity has granted relief in certain typical lines of cases where the doctrine of unfair competition seems to have been the guide to the decision, but where the basis upon which the relief was granted was the unfair taking of the complainant's property, rather than the deception of the purchaser, or the imitation of a patented or copyrighted article, or a registered trade-mark or trade-name.

In the cases of National Tel. News Co. et al. v. Western Union Tel. Co., 119 Fed. 294, 56 C. C. A. 198, 60 L. R. A. 805, and Illinois Commission Co. et al. v. Cleveland Tel. Co. et al., 119 Fed. 301, 56 C. C. A. 205, the dissemination of market news by a tape ticker was held not to be copyrightable; but the court determined that the business was lawful and involved the use of property which included intangible rights which were capable of illegal or inequitable appropriation and use by another party. The service of news by means of such a tape ticker was protected, and the further sale of the items of news given to the public by the ticker service was enjoined, apparently upon the theory that the appropriation of such property was the taking of that property from the person entitled to the enjoyment thereof. These cases were substantially approved by the Supreme Court of the United States in Board of Trade v. Christie Grain & Stock Co., supra, and the court says:

"The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff's"— comparing Bleistein v. Donaldson Lithographing Co., 188 U. S. 239, 23 Sup. Ct. 298, 47 L. Ed. 460.

And while the approval by the Supreme Court of the United States in this particular case seems to have been specially given because the acts complained of therein induced a breach of trust, it is difficult to see any distinction between the questions involved in the present litigation and that in the stock-ticker cases.

Another line of cases involving somewhat similar determinations are known as the "ticket-scalper cases," such as: Bitterman v. Louisville & N. R. R. Co., 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171, affirming Louisville & N. R. Co. v. Bitterman, 144 Fed. 34, 75 C. C. A. 192; Penna. Co. v. Bay et al. (C. C.) 150 Fed. 770; Illinois Central R. R. Co. v. Caffrey et al. (C. C.) 128 Fed. 770; Nashville, C. & St. L. Ry. Co. v. McConnell et al. (C. C.) 82 Fed. 65. And also the trading-stamp cases. Sperry & Hutchinson Co. v. Mechanics' Clothing

171 F.—61

Co. (C. C.) 128 Fed. 800; Same v. Louis Weber & Co. (C. C.) 161 Fed. 219, and cases therein cited.

In the ticket-scalper cases injunctions were granted, not because the purchasers of tickets were deceived by imitation or fraudulent tickets, but because the railroads issuing the tickets were injured by the trade in tickets obtained from them under special contracts, and then sold to other individuals who were not entitled to enjoy those contracts. In the trading-stamp cases, relief was granted, not to the extent of holding that trading stamps could not be transferred, nor upon the ground that persons obtaining trading stamps were being defrauded by a transfer of the right to redeem, but on the theory that the use of trading stamps as premiums, for the sake of soliciting trade by persons not parties to the original contracts under which the Sperry & Hutchinson Company agreed to issue the tickets, was a wrongful appropriation of property rights belonging to the Sperry & Hutchinson Company.

The present case is extremely like these just considered in principle. It is almost as if the court should be asked to enjoin individuals from theft, upon the ground that the criminal statutes did not make the taking of the particular kind of property in question larceny, and in cases where equitable relief was therefore appealed to because of the absence of any adequate remedy at law.

The principle involved is far-reaching, especially in that it carries the scope of equitable jurisdiction into matters frequently considered to be purely the result of business competition, and which, even if in themselves morally or financially wrong, are supposed to be without remedy where no contractual relations have existed from which suits for damages could arise. Various statutes have been passed in an attempt by legislation to protect certain classes of rights, such as the recording acts of the various states, and the lien laws of different jurisdictions. The patent, trade-mark, and copyright laws of different governments and the history of legislation as well as law, prove that where an act is admittedly wrong in the eyes of the public, and where the interests of individuals are being interfered with by commissions of the acts in question, legislation in the appropriate jurisdiction usually follows, and a legal remedy is created; but such legal remedies must be with relation to a specific class of acts. The jurisdiction of a court of equity has always been invoked to prevent the continuance of acts of injury to property and to personal rights generally, where the law had not provided a specific legal remedy, and it would seem that the appropriation of what has come to be recognized as property rights or incorporeal interests in material objects, out of which pecuniary profits can fairly be secured, may properly, in certain kinds of cases, be protected by legislation; but such intangible or abstract property rights would seem to have claims upon the protection of equity, where the ground for legislation is uncertain or difficult of determination, and where the principles of equity plainly apply. The so-called "common-law right" in literary property before its publication has long been recognized in the law. After the passage of legislation, literary property was secured, even in the published article, by the various copyright statutes of the different na-

tions. When such a copyright statute has been passed, all property rights in the published article must be secured and controlled by strict compliance with the statute.

It has been held that under the copyright law in effect prior to the 1st day of July, 1909, musical compositions, unless transcribed in print or musical characters, upon paper, were incapable of copyright (White-Smith Music Pub. Co. v. Apollo Co., 209 U. S. 1, 28 Sup. Ct. 319, 52 L. Ed. 655). Since the beginning of the present action, the copyright law has been amended, and since the 1st day of July, 1909, any form of recording or transcribing a musical composition, or rendition of such composition, has been capable of registration, and the property rights therein secured under the copyright statute (Act March 4, 1909, c. 320, 35 Stat. 1075).

It would seem therefore that the questions raised in the present case may be avoided as to future compositions by copyrighting the original rendition of the song, provided the singer has the right to use it for that purpose, and the disc record by which the rendition is preserved; but question will still remain as to the records produced prior to the present copyright law, and serious discussion may arise over the right obtained, for instance, by a grand opera singer who files a copyright for the resinging of a song already recorded by him or her, and sold to the public upon a disc record. With that we have nothing to do here, and the relief asked in this case would protect those who have already sung or played compositions having a pecuniary value, because of their musical excellence, and also the persons who have invested capital and labor in putting a valuable product upon the market. The education of the public by the dissemination of good music is an object worthy of protection, and it is apparent that such results could not be attained if the production of the original records was stopped by the wrongful taking of both product and profit by any one who could produce sound discs free from the expense of obtaining the original record.

It has been said in the case of American Washboard Co. v. Saginaw Mfg. Co., 103 Fed. 281, 43 C. C. A. 233, 50 L. R. A. 609, that the basis of recovery is the damage to property rights of the complainant, rather than the deception of the public. It is from this contended: The better the imitation, the greater reason there is for issuing an injunction. And, in the sense that the marketable qualities of an article can be appropriated by a good substitute, this statement is true; but it necessarily follows that the injury to reputation and to the demand for the article would be greater if the imitations do not prove satisfactory, and there be no way of informing the public that the genuine is preferable or superior. In the case of sound discs such as those involved in the present action, a careful comparison of the records is necessary to emphasize the superiority of the discs made with better material, more careful and experienced workmanship, and improved methods; and it is also evident that to the untrained ear such differences cannot be carried in mind and appreciated, unless the opportunity for direct comparison be immediately present. An actual playing of the discs introduced as evidence in this case illustrates the point involved, for the testimony and also experiments show that in

some cases the records sold by the defendant are with difficulty distinguished from those sold by the complainant, unless one is played immediately following the other and under the same circumstances, so that comparison would be fair.

Reference has been made to the rights of a photographer who should make a film for moving pictures, of some historical or unique occasion, and should sell the film to parties who should reproduce it in a moving-picture machine. Other parties might make pictures from the film, or from the exposures, and a question, in some respects, similar to the present, might be involved. A dressmaking establishment might employ high-priced designers, and their product might be copied, and the designs thus appropriated. Architects might build houses and utilize extremely valuable methods and ideas, and others building houses might follow these ideas. Sculptors might carve statutes of great commercial value, and stone carvers might copy these sculptures.

It cannot now be determined how far such appropriation of ideas could be prevented; but it would seem that where a product is placed upon the market, under advertisement and statement that the substitute or imitating product is a duplicate of the original, and where the commercial value of the imitation lies in the fact that it takes advantage of and appropriates to itself the commercial qualities, reputation, and salable properties of the original, equity should grant relief.

That is the particular proposition presented in the present case, and to that extent it seems to the court that the principles applied in the stock-ticker and similar cases above recited should be followed, and relief by injunction granted.